NO. 25-40024

# In the United States Court of Appeals for the Fifth Circuit

**POLARIS ENGINEERING, INCORPORATED,**

*Plaintiff–Appellee/Cross-Appellant,*

v.

**TEXAS INTERNATIONAL TERMINALS, LIMITED,**

*Defendant – Appellant/Cross-Appellee*

v.

**WESTCHESTER FIRE INSURANCE COMPANY**
*Defendant-Appellee.*

**Appeal from the United States District Court
for the Southern District of Texas, Galveston Division
Cause No. 3:21-CV-00094, Judge Jeffrey V. Brown**

## BRIEF OF APPELLEE/CROSS-APPELLANT POLARIS ENGINEERING, INC.

HAYNES AND BOONE, LLP

Mark Trachtenberg
mark.trachtenberg@haynesboone.com
Polly Fohn
polly.fohn@haynesboone.com
Kaylen Strench
kaylen.strench@haynesboone.com
1221 McKinney, Suite 4000
Houston, Texas 77010-2007
Telephone: (713) 547-2000

PILLSBURY WINTHROP SHAW PITTMAN LLP

Anthony Guerino
tony.guerino@pillsburylaw.com
Elizabeth E. Klingensmith
liz.klingensmith@pillsburylaw.com
609 Main Street, Suite 2000
Houston, Texas 77010
Telephone: (713)276-7695

***Counsel for Plaintiff- Appellee/Cross-Appellant Polaris Engineering, Inc.***

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**I.    Plaintiff - Appellant/Cross-Appellee**

Texas International Terminals, Limited

**II.    Counsel for Plaintiff - Appellant/Cross-Appellee**

*Appellate counsel*
Constance H. Pfeifer
Reagan William Simpson
Daniel N. Nightingale
Lilly Estella Hann
Yetter Coleman, LLP
811 Main Street, Suite 4100
Houston, Texas 77002

*Trial counsel*
Constance H. Pfeiffer
Reagan W. Simpson
Grant B. Martinez
Jason R. LaFond
Lily E. Hann
Yetter Coleman LLP
811 Main Street, Suite 4100
Houston, Texas 77002

Timothy Christian Ross
Hunter M. Barrow
Andrew James Clark
Emily W. Miller
Andrew Benjamin Bender
Andrews Myers P.C.
1885 Saint James Place, 15th Floor

Houston, Texas 77056

Eric Scott Lipper
Jeffrey A. Shadwick
Hirsch Westheimer PC
1415 Louisiana St., 36th Floor
Houston, Texas 77002

Sharon McCally
McCally Law, PC
2368A Rice Boulevard, Suite 422
Houston, Texas 77005

### III.    Defendant - Appellee/Cross-Appellant

Polaris Engineering, Incorporated (100% owned by Michael Nodier and Gerald Obluda)

### IV.    Counsel for Defendant - Appellee/Cross-Appellant

*Appellate counsel*
Mark Trachtenberg
Polly Fohn
Kaylen Strench
Haynes and Boone, LLP
1221 McKinney, Suite 4000
Houston, Texas 77010-2007

Anthony M. Guerino, II
Elizabeth Klingensmith
Pillsbury Winthrop Shaw Pittman, L.L.P
609 Main Street, Suite 2000
Houston, Texas 77002

*Trial counsel*
Anthony M. Guerino, II
Elizabeth E. Klingensmith
Ben Bernell
Jonathan Tyler Sink

Ryan Thomas Steinbrunner
Pillsbury Winthrop Shaw Pittman LLP
609 Main, Suite 2000
Houston, Texas 77002

Joseph R. Pousson, Jr.
Polaris Engineering, Inc.
212 W Pine St.
Lake Charles, Louisiana 70601

Mark R. Trachtenberg
Kent Rutter
Polly Fohn
Kaylen Strench
Haynes and Boone, LLP
1221 McKinney Street, Ste. 4000
Houston, Texas 77010

## V.    <u>Defendant-Appellee</u>

Westchester Fire Insurance Company

## VI.    <u>Counsel for Defendant-Appellee</u>

*Trial and appellate counsel*
Christopher Richard Ward
Daniel J. Olds
Ryan DeLaune
Clark Hill, P.L.C.
901 Main Street, Suite 6000
Dallas, Texas 75202

/s/ Mark Trachtenberg
Mark Trachtenberg

## STATEMENT REGARDING ORAL ARGUMENT

Given the size of the record and the number of issues raised in Texas International Terminals, Ltd.'s ("TXIT") appeal and Polaris Engineering, Inc. ("Polaris")'s cross-appeal, Polaris agrees that oral argument would aid the Court.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .................................................... i

STATEMENT REGARDING ORAL ARGUMENT ...........................................iv

TABLE OF CONTENTS ...................................................................................v

TABLE OF AUTHORITIES ..............................................................................ix

STATEMENT OF JURISDICTION....................................................................1

STATEMENT OF ISSUES PRESENTED ......................................................... 2

INTRODUCTION ............................................................................................. 4

STATEMENT OF THE CASE .......................................................................... 6

A.    Polaris agreed to build TXIT a simple crude distillation unit so TXIT
      could take advantage of a new market for low-sulfur fuels. .......................... 6

      1.    The parties entered into three principal contracts..............................7

      2.    The ISBL Agreement contained key milestones that were central
            to the allocation of responsibilities between the parties. ..................... 8

      3.    The contracts contemplated that the parties might need to
            modify Polaris's scope of work via change orders..............................10

B.    After the energy market plummeted during COVID, TXIT attempted
      to escape its obligations and avoid paying Polaris. ......................................10

      1.    The pandemic caused a "generational market disaster" that
            collapsed demand for marine fuel.....................................................10

      2.    TXIT refused to pay fully documented, mutually agreed change
            orders for work TXIT had already "gladly" accepted.......................12

      3.    TXIT claimed that the Facility suffered from performance issues
            but refused Polaris the opportunity to performance test...................12

4. When TXIT continued to withhold payment, Polaris sued. .............. 15

C. After the district court correctly interpreted key contractual terms on summary judgment, the jury vindicated Polaris on its contract claims and the district court entered judgment on the verdict. ............................... 16

SUMMARY OF THE ARGUMENT .................................................. 18

APPELLEE ARGUMENT ............................................................. 21

I. The district court's summary judgment rulings on the meaning and achievement of "stable operations" were correct. ..................................... 21

A. The district court properly construed "stable operations." ............. 22

B. The Facility reached "stable operations." .......................................... 27

C. TXIT is not entitled to a new trial. .................................................... 30

II. The trial court correctly entered judgment on the verdict. .......................... 32

A. The jury's answers to Questions 2 and 5 are easily reconciled. .......... 32

B. The jury's finding that TXIT committed the first material breach of the ISBL Agreement is supported by the evidence. ........................ 35

C. TXIT's arguments also fail because after it accepted the Facility, its remedy sounded only in warranty, not contract. ........................... 39

1. TXIT took and retained the Facility. ...................................... 41

2. TXIT never rejected the Facility. ............................................. 41

3. TXIT exercised control over the Facility in a manner inconsistent with Polaris's ownership. ................................... 42

III. The district court properly awarded Polaris damages for its unpaid change orders. ........................................................................................... 44

A. The jury's implicit finding that the change orders were part of the agreements is supported by legally sufficient evidence. ............... 45

   1. Polaris's change orders were mutually agreed. ........................ 45

   2. Polaris complied with all conditions necessary to recover its change orders damages. ....................................................... 52

   3. Polaris complied with the contract's dispute resolution procedures. ............................................................................ 55

  B. Polaris was not required to prove the reasonableness of its change order damages. ............................................................................... 56

  C. Regardless, ample evidence established the reasonableness of the change order damages. ........................................................................ 58

  D. Polaris's evidence was legally sufficient to recover on its alternative quantum meruit claim ....................................................... 61

IV. The awards to Polaris should be upheld in full. ........................................... 63

  A. TXIT is not entitled to an $18.8 million offset. ................................. 63

   1. TXIT failed to preserve or conclusively establish its belated continuing performance theory. .................................. 63

   2. Numerous other legal obstacles preclude any offset or recovery for TXIT's ISBL breach claim. ................................. 65

  B. The district court correctly awarded prejudgment interest. ............. 68

   1. The contracts do not waive prejudgment interest. .................. 68

   2. The district court properly awarded prejudgment interest under the Texas Prompt Payment Act. ................................... 70

V. Conditional cross-point: The district court improperly rejected Polaris's lost profits claim. ........................................................................ 72

CROSS-APPEAL ARGUMENT ........................................................................ 76

VI.    The district court erred as a matter of law in denying Polaris's request for attorneys' fees. ...................................................................76

    A.    Under the doctrine of "estoppel by contract," TXIT is bound by its representations and warranties that it is a Texas corporation........76

    B.    The district court erred in permitting TXIT to evade its contractual representations and warranties. ......................................78

VII.    Because TXIT's conversion claim fails as a matter of law, this Court should vacate the $1 million offset associated with that claim. ....................81

    A.    TXIT failed to prove ownership of the disputed equipment..............81

    B.    TXIT failed to offer legally sufficient evidence of damages. ..............86

VIII.    Because GCC's promissory estoppel claim fails as a matter of law, this Court should vacate the $1.05 million offset associated with that claim. .................................................................................................87

    A.    Promissory estoppel cannot be used offensively. ...............................87

    B.    Express contracts bar GCC's promissory estoppel claim. ................ 88

CONCLUSION..............................................................................................91

CERTIFICATE OF SERVICE.........................................................................93

ECF CERTIFICATION..................................................................................93

CERTIFICATE OF COMPLIANCE .................................................................93

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Al-Saud v. Youtoo Media, L.P.*,
754 F. App'x 246 (5th Cir. 2018) .............................................................. 79, 80

*Anthony Equip. Corp. v. Irwin Steel Erectors, Inc.*,
115 S.W.3d 191 (Tex. App.—Dallas 2003, pet' dism'd) ................................... 59

*Armco, Inc. v. S. Rock, Inc.*,
778 F.2d 1134 (5th Cir. 1985) ............................................................................ 30

*Armstrong v. Curves Int'l, Inc.*,
2017 WL 894437 (W.D. Tex. Mar. 6, 2017) ..................................................... 74

*Arrow Field Servs., LLC v. Linde Eng'g N. Am., Inc.*,
710 S.W.3d 856 (Tex. App.—Houston [1st Dist.] 2024, pet. filed) ................. 82

*Arthur W. Tifford, PA v. Tandem Energy Corp.*,
562 F.3d 699 (5th Cir. 2009) ............................................................................. 81

*Bachtell Enters., LLC v. Ankor E&P Holdings Corp.*,
651 S.W.3d 514 (Tex. App.—Houston [14th Dist.] 2022,
pet. denied) ...................................................................................................... 74

*Baker Hughes Process & Pipeline Servs., L.L.C. v. UE Compression,
L.L.C.*, 938 F.3d 661 (5th Cir. 2019) ................................................. 39, 40, 42

*Bartlett v. Bisbey*,
66 S.W. 70 (Tex. Civ. App. [1st Dist.] 1901, writ ref'd) ................................. 85

*Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*,
518 S.W.3d 432 (Tex. 2017) ............................................................................. 36

*Bluelinx Corp. v. Tex. Constr. Sys., Inc.*,
363 S.W.3d 623 (Tex. App.—Houston [14th Dist.] 2011, no pet.) ................... 61

*Bob Montgomery Chevrolet, Inc. v. Dent Zone Cos.*,
409 S.W.3d 181 (Tex. App.—Dallas 2013, no pet.) ......................................... 67

*Brennan v. Kaufman*,
  2021 WL 3729257 (Tex. App.—Houston [14th Dist.] Aug. 24,
  2021, pet. denied) (mem. op.) ............................................................. 74

*Buxani v. Nussbaum*,
  940 S.W.2d 350 (Tex. App.—San Antonio 1997, no pet.) .......................... 47, 48

*Carlton v. Cannon*,
  184 F. Supp. 3d 428 (S.D. Tex. 2016) ................................................. 22

*CCC Grp., Inc. v. S. Cent. Cement, Ltd.*,
  450 S.W.3d 191 (Tex. App.—Houston [1st Dist.] 2014, no pet.) .................... 57

*Chubb Lloyds Ins. Co. of Tex. v. Buster & Cogdell Builders, LLC*,
  668 S.W.3d 145 (Tex. App.—Houston [1st Dist.] 2023, no pet.) .................... 46

*Coastal Chem, Inc. v. Brown*,
  35 S.W.3d 90 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) ............... 40

*Construcciones Industriales Del Golfo, S.A. de C.V. v. Searex, Inc.*,
  1999 WL 423004 (5th Cir. 1999) (unpublished) ..................................... 87

*Criswell v. European Crossroads Shopping Ctr., Ltd.*,
  792 S.W.2d 945 (Tex. 1990) ............................................................... 53

*D2 Excavating, Inc. v. Thompson Thrift Constr., Inc.*,
  2021 WL 3144539 (S.D. Tex. July 26, 2021), *aff'd*, 2023 WL
  3562992 (5th Cir. May 19, 2023) ......................................................... 71

*DaimlerChrysler Motors Co. v. Manuel*,
  362 S.W.3d 160 (Tex. App.—Fort Worth 2012, no pet.) ............................. 57

*Dishon v. Lonesome Creek Resort, LLC*,
  2024 WL 4526088 (N.D. Tex. Aug. 5, 2024) .......................................... 74

*Doctors Hosp.1997, L.P. v. Sambuca Hous.*,
  L.P., 154 S.W.3d 634 (Tex. App.—Houston [14th Dist.] 2004,
  pet. abated) ..................................................................................... 88

*E.E.O.C. v. Simbaki, Ltd.*,
  767 F.3d 475 (5th Cir. 2014) ............................................................... 68

*Eckland Consultants, Inc. v. Ryder, Stilwell Inc.*,
  176 S.W.3d 80 (Tex. App.—Houston [1st Dist.] 2004, no pet.) ...................... 77

*Ellis v. Weasler Eng'g Inc.*,
  258 F.3d 326 (5th Cir. 2001) .............................................................. 33

*Endeavor Energy Res., L.P. v. Energen Res. Corp.*,
  615 S.W.3d 144 (Tex. 2020) ......................................................... 24, 69

*Epps v. Fowler*,
  351 S.W.3d 862 (Tex. 2011) ................................................................22

*Ewing Constr. Co., Inc. v. Amerisure Ins. Co.*,
  420 S.W.3d 30 (Tex. 2014) .................................................................24

*Exxon Shipping Co. v. Baker*,
  554 U.S. 471 (2008) ................................................................... 64, 68

*Fed. Ins. Co. v. Singing River Health Sys.*,
  850 F.3d 187 (5th Cir. 2017) ..............................................................78

*FFE Transp. Servs., Inc. v. Fulgham*,
  154 S.W.3d 84 (Tex. 2004) .................................................................60

*Finley Res., Inc. v. Headington Royalty Inc.*,
  672 S.W.3d 332 (Tex. 2023) ...............................................................84

*Flagship Credit Corp. v. Indian Harbor Ins. Co.*,
  481 F. App'x 907 (5th Cir. 2012) (per curiam) .......................................... 69, 84

*Freezia v. IS Storage Venture, LLC*,
  474 S.W.3d 379 (Tex. App.—Houston [14th Dist.] 2015, no pet.) ............. 77, 78

*Golden Spread Coop. v. Emerson Process Mgmt. Power & Water Solutions,
Inc.*, 360 F. Supp. 3d 494 (N.D. Tex. 2019), *aff'd* 954 F.3d 804
  (5th Cir. 2020) ...................................................................... 40, 43

*Harris Cnty. Water Control & Improvement Dist. No. 89 v. Phila. Indem.
Ins. Co.*, 31 F.4th 305 (5th Cir. 2022)......................................................73

*Heckman v. Gonzalez*-Caballero,
  65 F.4th 222 (5th Cir. 2023).............................................................36

*Hill v. Fitness Int'l, LLC,*
  2023 WL 2607646 (Tex. App.—Fort Worth Mar. 23, 2023, no
  pet.) (mem. op.) .................................................................................. 74

*Hutson v. Chambless,*
  300 S.W.2d 943 (Tex. 1957) ............................................................... 66

*In re Isbell Records, Inc.,*
  774 F.3d 859 (5th Cir. 2014) ......................................................... 30, 31

*Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.,*
  341 S.W.3d 323 (Tex. 2011) ........................................................... 27, 84

*Johnston v. Kruse,*
  261 S.W.3d 895 (Tex. App.—Dallas 2008, no pet.) ................... 58, 59

*Kim v. Am. Honda Motor Co.,*
  86 F.4th 150 (5th Cir. 2023) ............................................................... 45

*Lake v. Cravens,*
  488 S.W.3d 867 (Tex. App.—Fort Worth 2016, no pet.) ................... 88

*Lamajak, Inc. v. Frazin,*
  230 S.W.3d 786 (Tex. App.—Dallas 2007, no pet.) .......................... 59

*Landmark Org., L.P. v. Delphini Constr. Co.,*
  2005 WL 2560022 (Tex. App.—Corpus Christi–Edinburg
  Oct. 13, 2005, pet. denied) (mem. op.) .............................................. 71

*Lane v. R.A. Sims, Jr., Inc.,*
  241 F.3d 439 (5th Cir. 2001) ............................................................... 36

*Levco Constr., Inc. v. Whole Foods Mkt. Rocky Mountain/Sw. L.P.,*
  549 S.W.3d 618 (Tex. App.—Houston [1st Dist.] 2017, no pet.) ...... 71

*Mays v. Pierce,*
  203 S.W.3d 564 (Tex. App.—Houston [14th Dist.] 2006
  pet. denied) ........................................................................................... 57

*McCloskey v. Clubs of Cordillera Ranch, LP*,
    2017 WL 6502444 (Tex. App.—San Antonio Dec. 20, 2017,
    no pet.) (mem. op.) .......................................................................... 74

*McGinty v. Hennen*,
    372 S.W.3d 625 (Tex. 2012) (per curiam) ....................................... 56

*Meaux Surface Protection, Inc. v. Fogleman*,
    607 F.3d 161 (5th Cir. 2010) ........................................................... 59

*Mem'l Hermann Healthcare Sys. Inc. v. Eurocopter Deutschland, GMBH*,
    524 F.3d 676 (5th Cir. 2008) ........................................................... 73

*Mid-Continent Casualty Co. v. Global Enercom Mgmt.*,
    323 S.W.3d 151 (Tex. 2010) ........................................................... 46

*Mosaic Baybrook One, L.P. v. Simien*,
    674 S.W.3d 234 (Tex. 2023) ........................................................... 85

*Mustang Pipeline Co. v. Driver Pipeline Co.*,
    134 S.W.3d 195 (Tex. 2004) ........................................................... 54

*Nat. Gas Pipeline Co. of Am. v. Justiss*,
    397 S.W.3d 150 (Tex. 2012) ..................................................... 86, 87

*Newberry v. E. Tex. State Univ.*,
    161 F.3d 276 (5th Cir. 1998) ........................................................... 64

*O'Brien's Response Mgmt., L.L.C. v. BP Expl. & Prod., Inc.*,
    24 F.4th 422 (5th Cir. 2022) ........................................................... 63

*Occidental Petroleum Corp. v. Wells Fargo Bank, N.A.*,
    117 F.4th 628 (5th Cir. 2024) ......................................................... 90

*Oliver Res. PLC v. Int'l Fin. Corp.*,
    62 F.3d 128 (5th Cir. 1995) ............................................................. 87

*Orthoflex, Inc. v. ThermoTek, Inc.*,
    2013 WL 4045206 (N.D. Tex. Aug. 9, 2013) .............................. 40, 43

*Paragon Asset Co. v. Gulf Copper & Mfg. Corp.*,
    622 F. Supp. 3d 360 (S.D. Tex. 2022) ............................................ 46

*Parkway Dental Assocs., P.A. v. Ho & Huang Props., L.P.*,
   391 S.W.3d 596 (Tex. App.—Houston [14th Dist.] 2012, no pet.) .................. 57

*Patel v. Creation Constr., Inc.*,
   2013 WL 1277874 (Tex. App.—Dallas Feb. 27, 2013, no pet.)
   (mem. op.) .......................................................................................... 71

*Phillips v. Carlton Energy Grp.*,
   475 S.W.3d 265 (Tex. 2015) ............................................................... 46

*In re Pirani*,
   824 F.3d 483 (5th Cir. 2016) ............................................................... 54

*Pointe W. Ctr., LLC v. It's Alive, Inc.*,
   476 S.W.3d 141 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) ............... 57

*RAJ Partners, Ltd. v. Darco Constr. Corp.*,
   217 S.W.3d 638 (Tex. App.—Amarillo 2006, no pet.) ..................................... 71

*Riley v. Bank of N.Y. Mellon as Tr. for Certificateholders of CW ABS
   Inc., Asset-Backed Certificates, Series
   2004-5*, 2025 WL 919925 (Tex. App.—Beaumont
   Mar. 27, 2025, no. pet.) ...................................................................... 74

*Robles v. Exxon Corp.*,
   862 F.2d 1201 (5th Cir. 1989) ............................................................. 33

*Rollins v. Home Depot USA*,
   8 F.4th 393 (5th Cir. 2021) ................................................................. 55

*SB Int'l, Inc. v. Mike Jordan Co., Inc.*,
   2009 WL 10704364 (N.D. Tex. June 3, 2009) ................................................ 42

*Shaw Warehouse Co. v. S. Ry. Co.*,
   288 F.2d 759 (5th Cir. 1961) ............................................................... 30

*Sierra Club v. EPA*,
   884 F.3d 1185 (D.C. Cir. 2018) ............................................................ 22

*Simmons v. Briggs Equip. Transp.*,
   221 S.W.3d 109 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ..................... 60

*Smith v. Chrysler Grp., L.L.C.*,
909 F.3d 744 (5th Cir. 2018) ............................................................. 60

*Snyder v. Trepagnier*,
142 F.3d 791 (5th Cir. 1998) ............................................................. 33

*Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*,
327 S.W.3d 104 (Tex. 2010) ....................................................... 53, 54

*Stanwood Boom Works, LLC v. BP Expl. & Prod., Inc.*,
476 F. Appx 572 (5th Cir. 2012) (per curiam) ................................. 87

*Stauffer Chem. Co. v. Brunson*,
380 F.2d 174 (5th Cir. 1967) ............................................................. 46

*Summit Global Contractors, Inc. v. Enbridge Energy, Ltd. P'ship*,
594 S.W.3d 693 (Tex. App.—Houston [14th Dist.] 2019, no pet.) ................. 62

*Sw. Bell Med. Inc. v. Lyles*,
825 S.W.2d 488 (Tex. App.—Houston [1st Dist.] 1992,
writ denied) ........................................................................................ 59

*Sw. Bell Telephone Co. v. FDP Corp.*,
811 S.W.2d 572 (Tex. 1991).............................................................. 40

*Toshiba Machine Co. Am. v. SPM Flow Control, Inc.*,
180 S.W.3d 761 (Tex. App.—Fort Worth 2005, pet. granted,
judgm't vacated w.r.m.) ............................................................... 51, 59

*Tremble v. Wells Fargo Home Mortg., Inc.*,
478 F. App'x 164 (5th Cir. 2012) (per curiam) ................................. 88

*Tribble & Stephens Co. v. RGM Constructors, L.P.*,
154 S.W.3d 639 (Tex. App.—Houston [14th Dist.] 2004,
pet. denied)......................................................................................... 67

*Truly v. Austin*,
744 S.W.2d 934 (Tex. 1988)............................................................. 62

*Turner, Collie & Braden, Inc. v. Brookhollow, Inc.*,
642 S.W.2d 160 (Tex. 1982).............................................................. 66

*U.S. v. Real Prop. Located at 14301 Gateway Blvd. W., El Paso Cnty., Tex.*, 123 F.3d 312 (5th Cir. 1997) (per curiam) ................................. 65

*U.S. v. Stanford*,
    823 F.3d 814 (5th Cir. 2016) ....................................................... 44

*URI, Inc. v. Kleberg County*,
    543 S.W.3d 755 (Tex. 2018) ........................................................ 78

*Ventling v. Johnson*,
    466 S.W.3d 143 (Tex. 2015) ........................................................ 76

*Wallace v. Flintco Inc.*,
    143 F.3d 955 (5th Cir. 1998) .................................................. 63, 64

*Warner v. Talos ERT, L.L.C.*,
    133 F.4th 412 (5th Cir. 2025) ..................................................... 45

*In re Weekley Homes, L.P.*,
    180 S.W.3d 127 (Tex. 2005) ........................................................ 87

*Williams v. Colonial Bank, N.A.*,
    199 F. App'x 399 (5th Cir. 2006) (per curiam) .............................. 88

*In re Xerox Corp.*,
    555 S.W.3d 518 (Tex. 2018) ........................................................ 69

*Zachry Constr. Corp. v. Port of Hous. Authority of Harris Cnty.*,
    449 S.W.3d 98 (Tex. 2014) ............................................... 72, 73, 74

*Zhu v. Lam*,
    426 S.W.3d 333 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ........ 86

**Statutes**

Tex. Bus. & Com. Code § 2.602(a) ................................................... 42

Tex. Bus. & Com. Code § 2.606(a) ................................................... 41

Tex. Bus. Org. Code § 5.054 ........................................................... 77

Tex. Civ. Prac. & Rem. Code § 38.001 ............................ 3, 6, 18, 76, 78, 80, 81

Tex. Prop. Code § 28.002(a) ......................................................... 70

Tex. Prop. Code § 28.004(b) ......................................................... 70

2021 Tex. Sess. Law Serv. Ch. 665 (H.B. 1578) ........................ 76

**Rules**

FED. R. CIV. P. 9(c) ......................................................................... 53

FED. R. EVID. 613 ........................................................................... 30

FED. R. EVID. 701 ........................................................................... 59

**Other Authorities**

Alan Rossiter, Chem. Processing Newsletters, *"Energy Saver: Keep Your Plant at a Steady State"* (June 5, 2020) .................................... 22

BLACK'S LAW DICTIONARY (12th ed. 2024) .......................................... 82

C.T. Foster, *Building or Construction Contract Providing for Installment or "Progress" Payments as Entire or Divisible*, 22 A.L.R.2d 1343 (2025) ............................................................................................ 85

https://dictionary.cambridge.org/us/thesaurus/stable ........................ 29

https://www.merriam-webster.com/thesaurus/stable ......................... 29

Merriam-Webster Online Dictionary (2025) .................................. 22, 28

## STATEMENT OF JURISDICTION

Polaris agrees with and adopts TXIT's jurisdictional statement. (TXIT-Br. xiv.)

# STATEMENT OF ISSUES PRESENTED

*As Appellee*

1.  **"Stable operations."** Did the district court properly construe the undefined term "stable operations" in the parties' principal contract to mean "steady, consistent operations"?

2.  **Verdict consistency.** Did TXIT meet its high burden of showing that there is no view of the case that will make the jury's answers consistent, such that the district court abused its discretion by entering judgment on the verdict? Relatedly, did TXIT meet its high burden of showing that the jury's finding that TXIT materially breached the contract first was unsupported by factually sufficient evidence?

3.  **Change order damages.** Did the district court properly enter judgment on the jury's award of change order damages, when the evidence showed (and the jury implicitly found) that the change orders were mutually agreed, that Polaris complied with procedural prerequisites or that any non-compliance was excused, and ample evidence established the reasonableness of the change orders (even though Polaris had no such burden)?

4.  **Judgment formation.** Regarding TXIT's argument that it is entitled to an offset of $18.8M in "retrofit" damages notwithstanding the jury's prior material breach finding, did TXIT waive its complaint that Polaris's alleged continued performance negated the finding? If not, did TXIT meet its burden of conclusively proving that Polaris continued to perform after TXIT materially breached? Do numerous other legal obstacles preclude any offset or recovery? Did the district court properly award prejudgment interest of 1.5% per month, as authorized by the Texas Prompt Payment Act?

5.  **Conditional cross-issue: lost profits.** Should this Court reinstate Polaris's lost profits claim in the event of a new trial because there was sufficient evidence of TXIT's bad faith and the district court misapplied Texas precedent in concluding that such bad faith did not render unenforceable a pre-injury waiver of consequential damages?

*As Cross-Appellant*

1.  **Attorneys' fees.** Did the district court err in rejecting Polaris's claim for attorneys' fees under CPRC § 38.001 on the grounds that TXIT was a limited partnership, when, under the doctrine of contractual estoppel, TXIT should have been bound by its repeated representations that it was a corporation?

2.  **No conversion offset.** Did the district court err by offsetting the judgment by $1 million based on the jury's findings regarding TXIT's conversion claim, considering TXIT presented no evidence that it owned the disputed equipment and presented no competent evidence of damages?

3.  **No promissory estoppel offset.** Did the district court err by offsetting the judgment by $1.05 million based on the jury's findings regarding TXIT's promissory estoppel claim, considering that (1) promissory estoppel cannot be asserted offensively under Texas law, and (2) by TXIT's own admission, the parties' express contracts cover the same subject matter as the alleged promises?

## INTRODUCTION

In 2019, TXIT was eager to capitalize on a new market for low-sulfur fuels. It engaged Polaris, a world-renowned engineering firm, to design and build a simple crude distillation unit. But in 2020, as construction was underway, the world—and particularly, the fuel market—dramatically changed. The COVID pandemic created what TXIT itself called a "generational market disaster." TXIT's own analysis showed every barrel of the primary crude to be run through the facility would result in a loss. So, while Polaris diligently strived to fulfill the parties' bargain, TXIT hatched a plan to escape from it.

TXIT began by obstructing Polaris's progress. It placed Polaris in an impossible position by obscuring the designated point of contact for approving change orders and then faulting Polaris for its purported failure to obtain the "correct" internal signoff. It hamstrung Polaris by requiring costly COVID protocols and refusing to reimburse **Polaris's** resulting expenses. And it hampered Polaris's ability to pay its suppliers and subcontractors by refusing to make milestone payments.

Overcoming numerous obstacles, Polaris finished construction in May 2020. But after accepting the facility and agreeing in writing that it was mechanically

complete, TXIT attempted to revoke its acceptance months later, a "remedy" not permitted under the contract.

TXIT's duplicity reached an apex in July 2020. Once the facility reached stable operations, the contract required TXIT to allow Polaris to conduct a performance test (in fact, multiple tests, if needed). This milestone was Polaris's "moment of truth," in which Polaris would prove its facility could perform as promised.

But TXIT, seeking to avoid its payment obligations, denied Polaris this opportunity. Although TXIT acknowledged internally that the facility had achieved stable operations, it told Polaris the opposite, thus denying Polaris its contractual right to conduct performance testing. When TXIT's lie came to light, TXIT obfuscated by claiming the test was "futile" because the facility was designed incorrectly.

At trial, evidence confirmed the facility would have passed the performance test. But TXIT never gave Polaris that chance. Instead, TXIT, facing an unprecedented economic disaster, idled the facility to avoid further losses. It then manufactured a paper trail baselessly accusing Polaris of building a defective facility without offering it the chance to investigate or remedy any purported issues.

TXIT's attempt to blame Polaris was entirely pretextual. The jury agreed, having observed TXIT's witnesses contort themselves from their pre-trial positions as to whether mechanical completion or stable operations had been achieved or whether performance testing had occurred or was required.

For the reasons below, TXIT's attacks on the judgment fail. In fact, the judgment should have been larger. The district court improperly permitted TXIT an offset for two claims that should have failed as a matter of law. And it denied Polaris its requested attorneys' fees under Texas Civil Practice & Remedies Code ("CPRC") § 38.001 on the grounds that TXIT was a limited partnership, despite its clear contractual representations that it was a corporation.

## STATEMENT OF THE CASE

### A.   Polaris agreed to build TXIT a simple crude distillation unit so TXIT could take advantage of a new market for low-sulfur fuels.

TXIT is a crude oil processing company owed by Galveston businessman Todd Sullivan and his brothers. In 2019, TXIT was presented with a promising business opportunity: a new regulation reducing the amount of sulfur allowed in ship fuel oil was about to take effect, making low-sulfur, marine fuel oil ("MFO") extremely valuable. ROA.22672–73. Seeking to capitalize on this regulatory change, TXIT engaged Polaris, a world-renowned engineering firm, to construct a simple crude distillation unit ("the Facility") that would produce MFO. ROA.22673,

54806–831, 21179-83, 21184–85. GCC Supply & Trading ("GCC"), a commodity trading company also owned by the Sullivan brothers, was to supply crude oil to the Facility and sell the resulting products to customers. ROA.21254–57, 24740–41, 59801.

### 1.    The parties entered into three principal contracts.

The parties executed three primary agreements relating to the project—the ISBL Agreement, the OSBL Agreement, and the Dock Agreement.[1]

Each served a distinct but complementary purpose:

- **The ISBL Agreement** covered the design and construction of the Facility. ROA.54478.

- **The OSBL Agreement** provided for construction of infrastructure, such as tanks and piping, to support the Facility. ROA.54584.

- **The Dock Agreement** addressed the construction of a marine dock facility where ships could deliver and pickup crude. ROA.54688.

Westchester Fire Insurance Company furnished a $59 million performance bond backing Polaris's obligations on the ISBL Agreement. ROA.59610.

---

[1] "ISBL" means "inside the battery limits"; "OSBL" means "outside the battery limits."

### 2. The ISBL Agreement contained key milestones that were central to the allocation of responsibilities between the parties.

The primary contract was the ISBL Agreement, which contained detailed provisions governing the Facility's construction. ROA.54478. It divided the work into distinct stages and allocated responsibilities between the parties for each stage:

### § 10.1: Mechanical Completion

Once the work was mechanically complete, Polaris would issue a Notice of Mechanical Completion. ROA.54511 § 10.1(a). TXIT then had twenty-four hours to countersign the notice or identify specific deficiencies in writing. ROA.54511-12 § 10.1(c). Once the Facility reached Mechanical Completion, "care, custody and control" of the Facility shifted from Polaris to TXIT and the agreement's 24-month exclusive "Warranty Period" commenced. ROA.54494 § 4.5, ROA.54501 § 5.1(b)(xxxi), ROA.54513–14 § 10.2(a), ROA.54525 § 14.3.

### § 10.2: Commissioning, Start-Up, and Stable Operations

Upon Mechanical Completion, TXIT was responsible for starting up and "achiev[ing] stable operation of the Facility." ROA.54513 § 10.2(a)-(b); ROA.8077.

Upon achieving that milestone, TXIT was required to deliver a Notification of Stable Operations to Polaris. ROA.54514 § 10.2(c).

### §§ 10.3–.4: Performance Testing

Upon reaching stable operations, Polaris was entitled to conduct performance testing using TXIT-supplied conforming crude oil under the procedures described in Appendix G. ROA.54515 §§ 10.4(a),(c); ROA.54561 App. G. The purpose of performance testing was to confirm the Facility could meet certain "Performance Guarantees" set forth in Appendix F. ROA.54559-61. Appendix F contained two tables. Table 1 specified the properties of the crude to be used during the performance testing (referred to as "Table 1 crude"). Table 2 described the metrics that the Facility needed to achieve during the processing of the Table 1 crude for Polaris to satisfy the Performance Guarantees and "pass" the performance test. ROA.54559–61. The contract contemplated multiple test runs, and Article XIII guaranteed Polaris an opportunity to cure any test failure under the agreement's exclusive warranty regime. ROA.54515 § 10.4(e); ROA.54522-25 §§ 13.3-13.9.

The agreement provided that after a successful performance test, the project would reach Substantial Completion (§ 10.5), and—after completion of a punch list—Final Completion (§ 10.7). ROA.54515–19.

### 3. The contracts contemplated that the parties might need to modify Polaris's scope of work via change orders.

Because TXIT was eager to begin construction to capitalize on the low-sulfur fuel market, the parties included certain "critical assumptions" in Appendix A, with the understanding that they would adjust the scope of work—and the contract's lump-sum price—by change order if any of those critical assumptions proved incorrect. ROA.54546–54, 26392–95, 26490–92; *see also* ROA.21210.

All three contracts contained procedures for obtaining change orders to address unforeseen conditions, owner-requested scope additions, force majeure events, and other circumstances necessitating modifications. ROA.54504–08 § 6.2(a), ROA.54610–13, 54714–17. Section 6.8 required the parties to engage in a dispute-resolution process to resolve any disputed change orders. ROA.54507–08, 54613, 54717.

## B. After the energy market plummeted during COVID, TXIT attempted to escape its obligations and avoid paying Polaris.

### 1. The pandemic caused a "generational market disaster" that collapsed demand for marine fuel.

In early 2020—during construction—the global COVID-19 pandemic collapsed marine-fuel demand, gutted refining margins, and triggered widespread lockdowns. ROA.22683–95. The pandemic strained Polaris's supply chains, disrupted labor availability, and materially increased construction costs.

ROA.22223–26, 22483–86. Moreover, the specific crude oil the Facility was designed to process, Magellan East Houston crude ("MEH"), became particularly uneconomical to run, with internal TXIT analyses showing that every barrel processed would result in a loss. ROA.22685–95.

TXIT's own executives described the situation as a "worst of the worst" scenario and a "generational market disaster" and grew increasingly concerned that running MEH through the Facility would be financially devastating. ROA.23672–73, 26384–85, 61400, 22867–97. The following timeline, presented at trial, graphically demonstrates the economic pressures and market realities that drove TXIT's decision-making throughout this period.



See ROA.22677–731; see also ROA.61190, 61400, 61797–801, 61805.

2.    **TXIT refused to pay fully documented, mutually agreed change orders for work TXIT had already "gladly" accepted.**

During this period, TXIT field representatives agreed to change orders seeking adjustments to the schedule and contract price. ROA.23472–73. These change orders arose for various reasons explicitly contemplated by the contract, including increased costs and delays from compliance with TXIT's required COVID safety protocols, force majeure impacts of hurricanes and tropical storms, deviations from Appendix A's critical assumptions, and other changes requested by TXIT. ROA.28398–420; *see also* ROA.22226–28.

 Polaris performed work under these change orders, which TXIT "gladly" accepted. ROA.23705–08, 23796; *see also infra* Part III.A.1. Yet, in an effort to escape escalating costs and avoid projected losses, Sullivan later claimed that the change orders were never approved by the "correct" personnel, and then—rather than acting on them himself—often failed to respond to Polaris's requests at all. ROA.21192, 23401–02; ROA.54505 § 6.1(a); ROA.21211–12, 23474.

3.    **TXIT claimed that the Facility suffered from performance issues but refused Polaris the opportunity to performance test.**

Despite these difficulties, Polaris completed the Facility and provided TXIT with a Notice of Mechanical Completion on May 21, 2020. ROA.21220–21. After a joint walk-through, TXIT countersigned the certificate on June 2, 2020, signifying

its agreement that the Facility was mechanically complete, and shifting custody and control of the Facility to TXIT. ROA.60940, 21220–21, 23065–67; ROA.54511–12 § 10.1(b)–(c).

Over the next six weeks, TXIT's operators, assisted by Polaris, commissioned the Facility, introduced crude, and ran it continuously at approximately 30,000 barrels per day ("BPD"). Operating logs, laboratory data, and TXIT's own internal correspondence confirmed that by mid-July 2020, the unit was running "steady and consistent." ROA.26405, 27079; *see also* ROA.28969 (stating that the "unit has been running steady at around 30,000 barrels a day since July 18"); ROA.3498–99. The Facility was functioning so well, in fact, that TXIT was selling on-spec product. ROA.62706, 25072–73.

Due to market conditions, however, TXIT's financial troubles were mounting. So, in August 2020, TXIT's management internally decided to cut its losses by transitioning the Facility from "three-cut" mode to "two-cut" mode and

running 30,000 BPD "and no higher," in preparation to idle it for six months. ROA.61805, 61255, 23088–91, 22703.[2]

TXIT then concocted a pretext to terminate its contracts with Polaris and avoid further payments. Although it had acknowledged internally that the Facility reached stable operations, TXIT told Polaris the opposite and then created a paper trail of correspondence to Polaris, alleging it was having trouble running the Facility at 50,000 BPD and seeking troubleshooting support. ROA.22704–07, 48969, 61367. Although this was the "window of opportunity for performance testing"—and TXIT had the necessary crude—TXIT refused to provide Polaris a written Notice of Stable Operations and sold the Table 1 crude that it was required to supply for performance testing. ROA.22512–53. In doing so, it denied Polaris its right to demonstrate the Facility's performance or resolve any performance issues. ROA.21225–26, 21182, 22512–13, 23083.

Then, on September 3, 2020, TXIT sent Polaris a "Notice of Default" which attempted to "revoke" Mechanical Completion, even though the contract provided

---

[2] The Facility was designed to run in "three-cut" mode, meaning that it could separate crude oil into three primary products: (1) naphtha, (2) marine gas oil ("MGO"), and (3) marine fuel oil ("MFO"). ROA.22641–43. By switching to "two-cut" mode, TXIT mitigated its losses by producing only two products—naphtha and MFO—to fulfill its immediate contractual obligations. ROA.23217–18.

no method for doing so: under § 13.3, the exclusive remedy for defects following Mechanical Completion was through a warranty claim. ROA.4522–23, 62144 (PX388); ROA.22659–60. The notice did not invoke Article XIII's exclusive provisions and ignored Polaris's repeated requests to schedule performance testing using TXIT-supplied Table 1 crude, as the contract required. ROA.62144, 22659–60, *see also* ROA.23526. TXIT further claimed the Facility was "unsafe" and demanded a complete redesign, which was outside the agreement's scope. ROA.62144–47.

TXIT hired DRL, an outside engineering firm, to evaluate and upgrade the Facility at great expense—over $60 million—to produce new products (like jet fuel) and meet specifications that were not part of the original scope but would make the Facility more profitable under changed market conditions. ROA.22902, 26712.[3]

### 4.    When TXIT continued to withhold payment, Polaris sued.

Meanwhile, TXIT continued to withhold payment on all three contracts. ROA.22506–10. This was catastrophic for Polaris, which depended on TXIT's milestone and change order payments to pay its suppliers and subcontractors.

---

[3] After Russia's invasion of Ukraine caused oil prices to spike in February 2022, TXIT started up the Facility in March 2022 and made massive profits. ROA.22711-21.

ROA.22506–10. Michael Nodier, Polaris's owner and CEO, unsuccessfully attempted to resolve these issues with Sullivan directly. ROA.22232, 22239. When these efforts failed, Polaris filed suit. ROA.22506–07. TXIT formally terminated all three contracts by January 4, 2021. ROA.22820, 50375-76.

Polaris sought recovery of unpaid milestone payments and change orders, among other amounts owed. ROA.2754–85. It also sought lost profits from other contracts that it had won but could not perform because of TXIT's knowing misstatements to Polaris's bond broker, which resulted in the loss of Polaris's bonding capacity. *Id.*; *see also* ROA.13129-31.

TXIT counterclaimed for breach, demanded liquidated damages, and sought more than $60 million in "retrofit" costs associated with DRL's redesign of and modifications to the Facility. ROA.2787–830.

**C.    After the district court correctly interpreted key contractual terms on summary judgment, the jury vindicated Polaris on its contract claims and the district court entered judgment on the verdict.**

The district court addressed several contractual disputes on partial summary judgment, ruling for Polaris on key issues. The court held, among other things, that as a matter of law:

- The Facility had achieved Stable Operations because it was undisputed that it ran "steady [and] consistent" at 30,000 BPD;

- TXIT breached the ISBL Agreement by:

  - o failing to provide Polaris with a Notification of Stable Operations, and

  - o refusing to allow Polaris to conduct performance testing with TXIT-supplied Table 1 crude; and

- The Performance Guarantee in Appendix F applied only to crude oils that met Table 1 specifications and did not constitute a guarantee of naphtha yields for every existing crude type, all of which have different specifications than Table 1 crude.

ROA.8061–83.

During a five-week trial, Polaris presented extensive evidence of TXIT's inconsistent positions regarding the meaning of the ISBL Agreement and its attempts to frustrate Polaris's performance under the contracts. The district court submitted all of Polaris's claims to the jury except one—after much wavering, the district court barred Polaris's lost profits claim on TXIT's oral Rule 50 motion. *See infra* Part V.

The jury returned a verdict for Polaris on its breach of contract claims, finding:

- Both TXIT and Polaris breached the ISBL Agreement, but TXIT committed the first material breach, ROA.17743, 11746; and

- TXIT breached the OSBL Agreement and Dock Agreement, ROA.17759, 17767.

The jury awarded Polaris $22,851,529.48 in actual damages under all three agreements, which was far less than Polaris sought, ROA.17750, 17762–63, 17770. The jury also awarded some damages to TXIT: (1) $1 million in damages for its claim

that Polaris converted certain equipment, and (2) $1.05 million on its promissory estoppel claim (assigned to it by GCC) based on the theory that Polaris made additional, extra-contractual promises to GCC relating to the Facility's ability to process non-Table 1 crudes. ROA.17777, 17779.

The district court entered judgment on the verdict, awarding Polaris its contract damages plus prejudgment interest, minus $2.05 million in offsets for TXIT's promissory estoppel and conversion claims. ROA.17980–82. The district court denied Polaris's motion for attorneys' fees, concluding that Polaris could not recover against a limited partnership under CPRC § 38.001—despite TXIT's contractual representations that it was a corporation. ROA.21076–83. The trial court denied all post-judgment motions. ROA.21086. This appeal and cross-appeal followed.

## SUMMARY OF THE ARGUMENT

The district court's summary judgment interpretation of the undefined term "stable operations" to mean "steady, consistent operations" comports with dictionary definitions, uncontroverted record testimony (including internal TXIT correspondence), and common sense. TXIT's contrary interpretation violates basic principles of contract construction, creating redundancies and internal inconsistencies. Conclusive evidence established that the Facility did, in fact,

achieve stable operations, and TXIT has only itself to blame for the contortions its witnesses engaged in at trial to dispute that this milestone was achieved.

TXIT's attempts to manufacture inconsistencies in the verdict fare no better. TXIT does not even mention the applicable standard—whether the district court abused its discretion by entering judgment on irreconcilably inconsistent jury answers. Nor does it come close to meeting it, as there are multiple bases for reconciling the verdict. And ample evidence supports the jury's finding that TXIT materially breached first. Indeed, TXIT neither sought nor obtained a finding that any Polaris breach was material. In fact, TXIT's contract claim should not have been submitted at all. Conclusive evidence established that TXIT accepted the Facility; thus, its sole remedy was a breach of warranty claim.

TXIT's request for rendition on Polaris's change order damages also fails. Because the amounts awarded were contractual, benefit-of-the-bargain damages, not remedial damages, Polaris was not required to establish their reasonableness or necessity. Nor was Polaris required to prove the damages through expert testimony—Polaris's owner's lay testimony was sufficient under well-settled Texas law. Polaris presented extensive evidence establishing its unpaid change orders were mutually agreed and any compliance with procedural prerequisites was satisfied or any non-compliance excused. TXIT's arguments again ignore its legal burden. The

jury was instructed (and TXIT urged it) to reject damages for change orders that did not comply with the contract requirements, and the jury awarded far less than Polaris requested. TXIT bore the burden of demonstrating no legally sufficient evidence supports any theory the jury could have adopted to calculate its award, a burden TXIT did not meet by selectively targeting individual change orders.

Finally, there is no basis to reduce the judgment based on TXIT's request for a greater offset or its challenge to Polaris's prejudgment interest award. The jury's finding that TXIT materially breached first precluded an offset for ISBL breach damages. TXIT argues that this finding is nullified by Polaris's decision to continue performing, but TXIT never sought or obtained a finding supporting this theory, waiving this issue. And no evidence—much less conclusive evidence—supports it. Numerous other legal barriers (set out as cross-points below) bar TXIT's recovery. And TXIT's prejudgment interest challenges are untimely and rely on a patently unreasonable construction of the contracts.

In fact, the judgment should grow, not shrink. This Court should reverse the district court's denial of Polaris's attorneys' fees motion because TXIT is bound, under the doctrine of contractual estoppel, by its representations that it is a corporation. It thus is not entitled to invoke CPRC § 38.001's loophole that precludes awards against limited partnerships. Absent TXIT's false representation,

Polaris could have bargained for a contractual fee provision, as it did in other contracts. The Court should also vacate the $2.05 million in offsets for TXIT's conversion and promissory estoppel claims because both suffer from numerous legal deficiencies, outlined below.

This Court should correct these errors, remand for determination of the amount of Polaris's reasonable and necessary attorneys' fees, and affirm in all other respects.

## APPELLEE ARGUMENT

### I.     The district court's summary judgment rulings on the meaning and achievement of "stable operations" were correct.

TXIT's opening brief rests on the premise that the phrase "stable operations," as used in the ISBL Agreement, bore a hidden, highly technical meaning—"processing crude at a charge rate of 50,000 barrels per day"—and that the district court's refusal to graft that rate onto the definition triggered a cascade of purported error. TXIT-Br. 25. That premise is wrong. The court did exactly what Texas law demands when confronted with an undefined contractual term: it construed the phrase according to its ordinary meaning, in a manner that harmonizes every provision of the agreement. Applying the ordinary meaning, the court properly concluded the Facility reached stable operations as a matter of law. ROA.8076-80.

## A.     The district court properly construed "stable operations."

Article I of the ISBL Agreement includes **seven** pages of capitalized definitions—yet the term "stable operations" does not appear among them. ROA.41398-405, 22309. Nor does Appendix G, the Performance Test Procedures, purport to define the term. Instead, the contract simply requires TXIT, as Owner, to "achieve stable operation of the Facility." ROA.54513 § 10.2(b); *see also* ROA.54561. "When a contract leaves a term undefined, [courts] presume that the parties intended its plain, generally accepted meaning." *Epps v. Fowler*, 351 S.W.3d 862, 866 (Tex. 2011).

The district court followed that directive to conclude that "stable operations" means "steady, consistent operations," which—as even TXIT concedes—reflects the term's ordinary meaning. ROA.8077-78; Merriam-Webster's Online Dictionary (2025); ROA.27079 (Sullivan agreeing that, according to the dictionary, "stable" means "steady"); *Carlton v. Cannon*, 184 F. Supp. 3d 428, 490 (S.D. Tex. 2016) (equating "stable operations" with "steady state operations" in connection with production plant); *Sierra Club v. EPA*, 884 F.3d 1185, 1192, 1198-99 (D.C. Cir. 2018) (using "steady-state operations" and "stable operations" interchangeably in connection with industrial boilers); [Alan Rossiter, Chem. Processing Newsletters, *"Energy Saver: Keep Your Plant at a Steady State"* (June 5, 2020)](#) (industry

publication defining "stable operation" of a chemical plant as one operating at a "steady state"). TXIT's own operations manager confirmed that "stable operations occurs when the Facility is consistently running feedstock and demonstrating characteristics of a steady state, including that flows, temperatures and pressures are not shifting in an uncontrolled manner." ROA.3513 ¶ 9.

TXIT claims "the parties explicitly departed from ordinary meaning" and adopted a bespoke definition in Appendix G that equates stable operations with "operations at a crude oil charge rate of 50,000 BPD." TXIT-Br. 25. But Appendix G does no such thing. Appendix G states that it is TXIT's responsibility (as owner) to "Establish Stable Operations." ROA.54561. It is then Polaris's responsibility (as contractor) to conduct performance testing, the first step of which, under Appendix G, is to: "Establish and maintain stable operations **at a crude oil charge rate of 50,000 BPD.**" ROA.54561 (emphasis added); ROA.54515 §§ 10.2 (a), (d), (e).

The district court correctly observed that Appendix G "confirms that the court's interpretation is proper," while TXIT's contrary interpretation would upend the contract's structure and violate two fundamental principles of contract construction. ROA.8078-79. *First*, as the district court observed, TXIT's interpretation would render the phrase "at a crude oil charge rate of 50,0000 BPD" redundant—it would be unnecessary to specify the charge rate if the term "stable

operations" already encompassed a 50,000 BPD charge rate. ROA.8078; *see also Ewing Constr. Co., Inc. v. Amerisure Ins. Co.*, 420 S.W.3d 30, 37 (Tex. 2014). TXIT claims that redundancy is common in contracts, particularly when defining contract terms. TXIT-Br. 33. But it cites no Texas law supporting its claim, which contravenes Texas Supreme Court jurisprudence. *Ewing*, 420 S.W.3d at 37.

*Second*, as the district court also noted, TXIT's interpretation renders Appendix G internally contradictory. ROA.8078. If "Stable Operations" encompassed a requirement of 50,000 BPD, then the first provision under "Owner Responsibilities" would impose upon TXIT the requirement to establish stable operations at 50,000 BPD, while the first and fifth provisions under "Test Procedure" would contradict that by suggesting that it was **Polaris's** responsibility to establish stable operations at 50,000 BPD during testing. ROA.54561; *see also* ROA.54515 §§ 10.2 (a)-(e) (stating that it was Polaris's responsibility to conduct performance testing in accordance with the Test Procedures). Courts should construe contracts to avoid such contradictions. *See Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 148 (Tex. 2020). Common sense supplies a way to avoid any inconsistency: TXIT must establish "Stable Operations," at an unspecified rate, while Polaris must then establish and maintain "Stable Operations" at **50,000 BPD** as part of the performance testing.

TXIT attempts to resolve this contradiction a different way, claiming it was TXIT's responsibility to "establish" stable operations at 50,000 BPD and then Polaris's responsibility to "maintain" stable operations at 50,000 BPD. TXIT-Br. 32. TXIT goes so far as to argue that "Polaris has no responsibility for reaching the threshold step of 'establishing' Stable Operations [at 50,000 BPD], which rests expressly with TXIT." *Id.* That is patently false. Again, while TXIT had the threshold responsibility to establish stable operations **at an unspecified rate** as part of its "Owner's Responsibilities," it was Polaris's responsibility, as part of performance testing, to: "**Establish** and maintain stable operations **at a crude oil charge rate of 50,000 BPD**." ROA.54561 (emphasis added); ROA.54515 § 10.2.

TXIT also claims that the charge rate was not a "criteri[on]" to be tested, but rather a "condition" under which testing was be conducted and, therefore, it would be "nonsensical" to proceed with performance testing if the Facility was not already running at 50,000 BPD. TXIT-Br. 26, 31. Yet, the whole purpose of performance testing was to allow Polaris to prove the Facility could meet its Performance Guarantees. ROA.54561. The very first Performance Guarantee is that the Facility could handle a minimum crude feed rate of 50,000 BPD:

| Table 2 | | | | |
| Performance Guarantee | | | | |
| Criteria | Minimum | Maximum | Method | Tolerance |
|---|---|---|---|---|
| Crude Feed Rate, BPD | 50,000[5] | | Orifice Plate | +/- 5% |
| MFO Yield, LV% on Crude | 42.6[6] | | Orifice Plate | +/-10% |
| MFO Product Flash Point, °F | 140 | NA | D93 | -0% |
| MGO Yield, LV% on Crude | 35.4[6] | | Orifice Plate | +/-10% |
| MGO Product Flash Point, °F | 140 | NA | D93 | -0% |
| Naphtha Yield, LV% on Crude | | 18.8[6] | Orifice Plate | +/-10% |
| Naphtha Product Reid Vapor Pressure, psi | NA | 9.0 | ASTM D323 | -0% |
| Naphtha Product Color | +20 | | Saybolt ASTM 156 | -0% |

ROA.54559, 54561. Thus, achieving 50,000 BPD was an aim of performance testing—not, as TXIT contends, a preceding condition.

It is TXIT's interpretation—not Polaris's—that is "nonsensical." The contract states that TXIT "may choose to run the Performance Test at 25,000 BPD instead of 50,000 BPD." ROA.54561. It would be illogical to require the Facility to run stably at 50,000 BPD before commencing a performance test at 25,000 BPD. Nor would it make sense for the contract to place upon TXIT the responsibility of (1) proving that the Facility could run at the desired rate, and (2) correcting such deficiencies if it could not. ROA.54514 § 10.2(d)(ii)(2) (stating that if the Facility could not achieve stable operations, it was TXIT's responsibility to "correct the deficiencies" at its "sole cost and expense"). That is precisely why TXIT's obligation to achieve "stable operations" was not tied to a specific charge rate. To borrow TXIT's automobile analogy, it was TXIT's responsibility to start the engine

and run it stably but Polaris's responsibility to take the car out on the highway to show that it could perform at the desired speed.

*Finally*, TXIT cannot fall back on the term's purported ambiguity because under Texas law, contractual terms are only "ambiguous" when they are susceptible to two "**reasonable**" interpretations. *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). Because TXIT's interpretation is not reasonable, the contract is unambiguous and supports the judgment against TXIT.

### B.  The Facility reached "stable operations."

TXIT has never disputed that the Facility ran at a steady, consistent rate of 30,000 BPD. ROA.8079. The record is replete with evidence from TXIT's witnesses confirming this finding:

```
A.    I agree that the plant ran steady.
```

ROA.27079.

```
16      Q.    But you did achieve stable operations at
17   30,000 barrels per day; correct?
18      A.    Correct.
```

ROA.24088; *see also* ROA.28969 (the "unit has been running steady at around 30,000 barrels a day since July 18"); ROA.3499 (acknowledging the Facility ran at a

"steady feed rate of 30,000 barrels a day since July 18th, that's correct"); ROA.3498 ("I believe [the Facility's] running at a steady rate"). Indeed, TXIT was selling production from the Facility during this period, reinforcing that it had reached stable operations. ROA.3507; *see also* ROA.23501 (testifying the Facility was producing "on-spec" product and had reached stable operations). As the district court correctly held: "Under the plain meaning of stable operations, running stably at 30,000 barrels per day in two-product mode qualifies as stable operations." ROA.8079.

TXIT attempts to equate "stable operations" with "safety." TXIT-Br. 34-35. But the two terms are distinct. "Safe" means "free from harm or risk." *See* Merriam-Webster Online Dictionary (2025). "Stable" means steady and consistent. *See id.* For example, a patient in "stable" condition has steady and consistent vital signs, but is not necessarily free from all further harm or risk.

TXIT finds no support in an online thesaurus that refers to "safe" and "stable" not as true synonyms, but merely as "similar words" with **lesser relevance** to one another:



*See* Merriam-Webster Online Thesaurus (2025).[4] Texas law does not construe contracts by substituting words that have similar but different meanings.

Regardless, TXIT identifies no evidence of any safety incidents that occurred during the period in which the district court found that the Facility reached stable operations.[5] In July and August of 2020, TXIT started up the Facility again and ran it at a stable rate of 30,000 BPD, allowing TXIT to process and sell crude. ROA.23501-02, 22697, 23495. Accordingly, as the district court concluded and

---

[4] https://www.merriam-webster.com/thesaurus/stable. The Cambridge English Thesaurus lists "safe" as a synonym of "stable," but only in the context of referring to a building as having a "stable foundation," not in any other context. *See* https://dictionary.cambridge.org/us/thesaurus/stable.

[5] TXIT points to evidence that a fire occurred at the Facility during startup and identifies alleged design defects that it claims contributed to the fire. TXIT-Br. 35. But that fire occurred in June 2020, **before** the Facility reached stable operations, and was caused by **TXIT's operator error**, not a design defect. ROA.22153, 23202, 21304-10, 23074-77, 23496-98.

TXIT's own witnesses confirmed, the Facility ran steady and was not likely to fail. ROA.24088, 27079.

### C.    TXIT is not entitled to a new trial.

TXIT claims that the trial court's alleged error resulted in an "unjustified" attack on TXIT's CEO, Sullivan, necessitating a new trial on all its contract claims, even though the term "stable operations" appears **only** in the ISBL Agreement. TXIT-Br. 36-41. This argument fails because, as explained above, the district court did not err. Regardless, there was no "unjustified" attack on Sullivan's credibility. TXIT-Br. 37.

Impeachment is an integral part of trial that aids the factfinder in rooting out truth. *See* FED. R. EVID. 613. Lawyers are also allowed wide latitude in cross-examination and closing arguments. *See Shaw Warehouse Co. v. S. Ry. Co.,* 288 F.2d 759, 777 (5th Cir. 1961); *Armco, Inc. v. S. Rock, Inc.*, 778 F.2d 1134, 1140 (5th Cir. 1985). These matters traditionally lie within the trial court's sound discretion and where, as here, no objection is made to closing arguments, this Court reviews only for plain error. *In re Isbell Records, Inc.*, 774 F.3d 859, 872 (5th Cir. 2014). TXIT has not shown any impropriety under this standard—much less plain error.

Sullivan's trial testimony differed markedly from his depositions. He said in depositions that no performance testing had occurred. *See, e.g.*, ROA.26988, 26413-

14, 26417, 26420, 26988, 50377. But at trial, he testified that performance testing did occur—several times, no less. *See, e.g.*, ROA.26403, 26408, 26988-89. Sullivan's testimony about stable operations also changed, as he conceded. *Compare* ROA.26407 *with* ROA.62147. When asked at trial: "[F]or the last three years you have taken a different position than you have taken in the last two days in this courtroom, correct?," Sullivan answered, "Yes, sir." ROA.26412.

Polaris properly impeached Sullivan on those inconsistencies and rightly challenged his credibility in closing. *See In re Isbell Records, Inc.*, 774 F.3d at 872 (holding it was not error to refer to the defendant as a "thief" in closing statements, when there was evidence that he had willfully infringed on the plaintiff's copyright). TXIT tries to blame the district court, claiming that its summary judgment ruling "forced" Sullivan "to revise his explanation" of events at trial. TXIT-Br. 39. But it was the sole province of the jury to determine whether there was an innocent explanation for Sullivan's shifting testimony (as TXIT argued) or whether Sullivan's

willingness to change his story impacted his credibility (as Polaris argued). The jury found for Polaris.[6]

Finally, under no circumstances would TXIT be entitled to a new trial on its claims for breach of the Dock or OSBL Agreements. The term "stable operations" appears only in the ISBL Agreement and is relevant only to that contract.

## II. The trial court correctly entered judgment on the verdict.

TXIT's complaints about the verdict fail because (1) there is no irreconcilable conflict under the applicable standard, which TXIT ignores; (2) the jury's prior material breach finding is supported by sufficient evidence; and (3) TXIT's argument improperly assumes it had a viable contract claim.

### A. The jury's answers to Questions 2 and 5 are easily reconciled.

In Q2, the jury found TXIT materially breached the ISBL Agreement by failing to provide Polaris an opportunity to performance test. ROA.17740. In Q5, the jury found Polaris failed to comply with the Performance Guarantee in Appendix F of the ISBL Agreement. ROA.17743-44.

---

[6] The district court nonetheless took additional measures to protect TXIT's witnesses. The court restricted Polaris's references to the court's summary judgment rulings to the passive phrase "it has been decided that…." ROA.16851. It also closely monitored for any potential prejudice arising from its rulings and Polaris's cross-examination of TXIT's witnesses and, two weeks into the trial, noted: "The more I hear, the less concerned I am [about any potential prejudice]." ROA.26381.

- 32 -

These findings are **not** "irreconcilably inconsistent," which is the exacting standard for disregarding a special verdict. *Robles v. Exxon Corp.*, 862 F.2d 1201, 1204 (5th Cir. 1989). The mere possibility of inconsistency—or even confusing answers which **appear** to conflict—does not necessarily warrant a new trial. *Ellis v. Weasler Eng'g Inc.*, 258 F.3d 326, 343 (5th Cir. 2001). Moreover, the district court "has discretion to decide whether a jury's findings on a verdict form are incomplete, confusing, or inconsistent and whether to resubmit the claim to the jury" and its decision to enter judgment on the verdict is owed deference and is reviewed only for an abuse of discretion. *Id.* at 342–43. This Court may only disturb the verdict if, after making a concerted effort to reconcile the jury's answers, it concludes "there is no view of the case that will make the jury's answers consistent." *Snyder v. Trepagnier*, 142 F.3d 791, 800 (5th Cir. 1998).[7]

TXIT ignores this standard. It instead presents a single theory that **could** render the answers inconsistent. TXIT argues that the jury's answer to Q5 "confirmed that Performance Testing would have been futile," which TXIT

---

[7] TXIT laments that the "apparent conflict" in the jury's answers likely arose from lack of predication and improper sequencing of "the confusing jury charge," TXIT-Br.47—complaints it never raised below.

incorrectly claims is inconsistent with the jury's finding in Q2 that it materially breached the contract by failing to allow Polaris to performance test. TXIT-Br. 44.

But the jury **did not** find that performance testing was futile—it found that Polaris failed to comply with the performance guarantee in some unspecified way. ROA.17743-44. Many theories fully consistent with the verdict yield that conclusion. For example, the jury could have concluded that the Facility failed to meet the performance guarantees when Table 1 crudes were first run in August 2020, while also crediting Nodier's testimony that Polaris would have identified and fixed any problems revealed by performance testing at its own expense. ROA.21183, 21228, 26060–62, 22952–53. This was, in fact, Polaris's right under the contract's exclusive warranty provision. ROA.54523–24, 54525 § 13.3, § 13.9.

Ample evidence supports that the Facility was capable of satisfying the Performance Guarantees—and that it was not, as TXIT has previously suggested, "unfixable." *See* ROA.22961, 22650–51, 22653, 23083. Expert computer simulations (that are standard in the industry) showed that the Facility would have reached 50,000 BPD with small alterations to reflux and pressure. ROA.22652–53; *see also* ROA.22636. According to these experts, the Facility "was designed to meet the performance guarantees." ROA.23083. Moreover, numerous witnesses testified that Polaris built the Facility with significantly greater capacity and margin than the

"blueprint" design, meaning it could still meet the guarantees through relatively minor adjustments. ROA.48977, 22871–72. Both parties' witnesses corroborated this statement. *See* ROA.22870 (Nodier testifying TXIT's own records showed the Facility could extract 27.8% naphtha compared to the 18.8% referenced in App. F, Table 2), ROA.27658 (confirming the Facility's heat exchanger was built with 50% additional capacity), ROA.22960–63 (confirming the Facility was large enough to handle 50,000 BPD of naphtha and Table 1 crude), ROA.27614 (customary to add 10% extra capacity to initial design), ROA.25645–46 (DRL's principal testifying to the same).

In short, it is plausible that the jury concluded both that TXIT initially breached its obligation to allow Polaris to test (Q2) and also that, if TXIT had complied, the test would have revealed only immaterial deficiencies (Q5) that Polaris would have fixed. TXIT cannot meet its burden to show the district court abused its discretion by entering judgment on an irreconcilable verdict.

## B. The jury's finding that TXIT committed the first material breach of the ISBL Agreement is supported by the evidence.

TXIT is also wrong that the jury's Q7 finding that TXIT materially breached first "contradicts the great weight of evidence." TXIT-Br. 46-47.

A trial court's denial of a motion for a new trial "will be affirmed unless there is a clear showing of an absolute absence of evidence to support the jury's verdict,

thus indicating that the trial court had abused its discretion in refusing to find the jury's verdict contrary to the great weight of the evidence." *Lane v. R.A. Sims, Jr., Inc.*, 241 F.3d 439, 444 (5th Cir. 2001) (quotations omitted). This standard of review is "burdensome for an appellant" and TXIT cannot meet it. *Heckman v. Gonzalez-Caballero*, 65 F.4th 222, 226 (5th Cir. 2023).

TXIT's argument assumes: (1) Polaris's breach of the Performance Guarantee was material; (2) Polaris's breach of the Performance Guarantee occurred **before** TXIT materially breached by refusing to allow Polaris to performance test; and (3) TXIT's refusal to allow Polaris to performance test was its only material breach. TXIT's argument depends on all three assumptions being correct—and none of them are.

*First*, Q5 merely asked whether Polaris **failed to comply** with the Performance Guarantee. ROA.17743-44. The jury never found Polaris **materially** breached the Performance Guarantee. And in fact, ample evidence supports any breach was immaterial. Under Texas law, materiality turns in part on "the likelihood that the party failing to perform or to offer to perform will cure his failure." *Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 437 (Tex. 2017). As discussed above, the jury could have determined Polaris would have corrected any defects revealed through a performance test. *See supra* pp. 34-35. Thus, regardless of

when Polaris's alleged breach occurred, the jury could have reasonably found TXIT's failure to allow Polaris to performance test was the first **material** breach by either party.

*Second*, TXIT improperly assumes that any breach of the Performance Guarantee by Polaris must have occurred **before** TXIT refused to allow performance testing. TXIT's breach occurred when it failed to notify Polaris that the Facility reached stable operations and refused performance testing in **July 2020**. ROA.26405, 27079; *see also* ROA.28969. The jury could have found that any breach by Polaris occurred later, after TXIT finally ran Table 1 crudes through the Facility in **August 2020**. ROA.26060–62, 22952–53. The contract required that Table 1-conforming crude be input into the Facility so that Polaris could test the output product "per Table 2 of Appendix of this Agreement" and "retest until [the] Performance Guarantees are demonstrated." ROA.54515, 54561; App. G. Because the Performance Guarantee applied only to Table 1 crudes, there was no way to assess the Facility's capacity to meet the guarantee until this point. Therefore, even

if the jury had found that Polaris had materially breached, it could have reasonably found TXIT materially breached first.[8]

*Third*, although TXIT assumes that the prior material breach found in Q7 must have been its failure to allow Polaris to performance test, that assumption disregards the jury's Q3 finding that TXIT breached other provisions of the ISBL Agreement as well. ROA.17741. Several of TXIT's breaches could have been material and preceded performance testing, including its failure to designate an owner's representative within three days of executing the ISBL Agreement and its failure to follow the contractual change order procedures. *See infra* Part III.

For any (or all) of these reasons, the jury's Q7 finding is not against the "great weight of the evidence," and the district court did not abuse its discretion in denying TXIT's motion for new trial.

---

[8] On appeal, TXIT does not clearly identify the breach it believes occurred before July 2020. TXIT-Br.46-47. But in closing argument below, TXIT urged that Polaris's breach was a design error that occurred **at the time the ISBL Agreement was executed**, based on its theory that the FEL-2 study (which predated the ISBL Agreement) contained promises about the design of the Facility that were incorporated by reference into the ISBL Agreement. ROA.28043. But the jury properly rejected this theory, ROA.17746, and for good reason. The FEL-2 Report was just an informational study, it does not contain any enforceable promises or performance guarantees. ROA.54544. And, as a matter of law, it was not incorporated by reference into the ISBL Agreement. *See infra* notes 14 & 15. Thus, TXIT's theory that Polaris breached the ISBL Agreement through a "design error" before the Facility had ever run Table 1 crudes is legally invalid. Any breach of the ISBL Agreement could have only occurred when the Facility failed to perform as promised based on the testing conditions identified in the contract (which contemplated a test performed by Polaris).

### C.    TXIT's arguments also fail because after it accepted the Facility, its remedy sounded only in warranty, not contract.

TXIT's complaints should be rejected for another, independent reason as well: TXIT's claim for breach of the ISBL Agreement, which the district court submitted in Q5, is legally invalid. Because conclusive evidence established that TXIT accepted the Facility, TXIT's sole remedy was the contractually-provided for exclusive warranty claim—a remedy it failed to pursue. Therefore, the district court should have disregarded the jury's answer to Q5, which would have mooted TXIT's argument that Q2 and Q5 are irreconcilable and its argument that the breach found in Q5 occurred first.[9]

"Breach of contract and warranty claims are distinct causes of action under Texas law and provide for different remedies, and Texas law forbids conflating breach of warranty and breach of contract." *Baker Hughes Process & Pipeline Servs., L.L.C. v. UE Compression, L.L.C.*, 938 F.3d 661, 666 (5th Cir. 2019). Whether a contract is for goods or services, the same rule controls: If a party finally accepts goods or services despite any non-conformity, its exclusive remedy is for breach of

---

[9] Polaris repeatedly raised this issue below to no avail. ROA.14185, 17459–65, 27746, 20044–49. Polaris's JMOL Reply elaborates further and rebuts the baseless counterarguments TXIT asserted below. ROA.20870.

warranty. *Id.*; *accord Sw. Bell Telephone Co. v. FDP Corp.*, 811 S.W.2d 572, 576–77 (Tex. 1991).

Accordingly, because evidence conclusively established that TXIT accepted the Facility, its breach of contract claim is barred. *See Golden Spread Coop. v. Emerson Process Mgmt. Power & Water Solutions, Inc.*, 360 F. Supp. 3d 494, 507 (N.D. Tex. 2019), *aff'd* 954 F.3d 804 (5th Cir. 2020) ("Because GSEC accepted the DCS, it cannot maintain a breach of contract action and is limited to only a warranty claim."); *accord Orthoflex, Inc. v. ThermoTek, Inc.*, 2013 WL 4045206, at *8 (N.D. Tex. Aug. 9, 2013); *Coastal Chem, Inc. v. Brown*, 35 S.W.3d 90, 96 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (after mechanical completion, the Owner's "remedy for any defective workmanship was in [the Contractor's] continuing obligations under the warranty provision").

As the district court correctly instructed, TXIT accepted the Facility if:

  1) after a reasonable opportunity to inspect the Facility, TXIT took or retained ownership of the Facility in spite of any non-conformity, OR

  2) TXIT failed to notify Polaris, within a reasonable time after Mechanical Completion and after TXIT had a reasonable opportunity to inspect the Facility, that it was rejecting the Facility, OR

  3) TXIT took any act inconsistent with Polaris's ownership of the Facility, such as altering or changing the Facility.

ROA.17742; *see also* Tex. Bus. & Com. Code § 2.606(a).

While each scenario independently establishes acceptance, here all three were conclusively established, notwithstanding the jury's contrary answer.

### 1.   TXIT took and retained the Facility.

TXIT indisputably "took" and "retained ownership of the Facility in spite of any non-conformity." ROA.17742. It is undisputed that the Facility reached Mechanical Completion in May 2020. TXIT-Br. 8. Under the ISBL Agreement, this milestone meant "care, custody, and control" of the Facility shifted to TXIT and it bore "the risk of loss of the Facility and all Equipment." ROA.54494 § 4.5, ROA.54525 § 14.3. Indeed, it is undisputed that TXIT **has retained and operated (and profited handsomely from) the Facility to this day.** *See* ROA.25058–61 (TXIT fulfilled contracts to sell naphtha and MFO in 2020), ROA.26447–48 (TXIT ran 804,000 barrels of crude oil through the Facility during summer 2020 and sold it), ROA.22720 (TXIT reaped major profits from retrofitted Facility). These facts alone conclusively establish TXIT accepted the Facility.

### 2.   TXIT never rejected the Facility.

The evidence also conclusively established that TXIT never effectively rejected the Facility. "Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller."

Tex. Bus. & Com. Code § 2.602(a). "[A]fter rejection any exercise of ownership by the buyer with respect to any commercial unit is wrongful as against the seller." *Id.* § 2.602(b).

Under § 10.1(c), titled "Owner Approval or Rejection," TXIT had twenty-four hours to inspect the Facility and identify any potential defects warranting correction or rejection after it received notice of Mechanical Completion. ROA.54512 § 10.1(c). After that point, TXIT's only available remedy was a warranty claim—not rejection. ROA.54492 (defining "warranty period"); ROA.54521, 54525 §§ 13, 14.3. TXIT not only failed to reject the Facility within this period, it returned a signed certificate **acknowledging** mechanical completion. ROA.21220.

### 3. TXIT exercised control over the Facility in a manner inconsistent with Polaris's ownership.

Finally, the evidence conclusively establishes that TXIT exercised control over the Facility in a manner inconsistent with Polaris's ownership by spending $64 million to "retrofit" or upgrade the Facility. TXIT-Br. 14. "If a buyer retains and uses, alters, or changes the goods, it will be found to have accepted them." *Baker Hughes*, 938 F.3d at 667; *see also SB Int'l, Inc. v. Mike Jordan Co., Inc.*, 2009 WL 10704364, at *2 (N.D. Tex. June 3, 2009) ("There is no shortage of cases in Texas finding that a buyer's post-rejection repair, modification, or use of non-conforming goods constitutes acceptance as a matter of law.")

\*    \*    \*

Because the evidence conclusively establishes TXIT accepted the Facility, its sole remedy was a warranty claim. *Golden Spread*, 360 F. Supp. 3d at 507; *Orthoflex,* 2013 WL 4045206, at \*8. This result is dictated not only by the aforementioned, well-settled common law, but also by the ISBL Agreement. Under § 13.3, Mechanical Completion triggered a two-year "warranty period." ROA.54522 § 13.2, ROA.54492. During this window, the contract specifically limited TXIT's remedies for any defects to Article XIII's exclusive warranty provision. ROA.54522–25. The contract required TXIT to follow a series of prescribed steps to invoke this provision, including providing notice of a defect and giving Polaris the opportunity to perform corrective work. ROA.54522–23 § 13.3(a). The record conclusively shows that TXIT did not follow these procedures before asserting its counterclaims, and it did not assert a warranty claim in the underlying litigation. ROA.62144, 22659–60, 22898–902 (Nodier explaining notice of default is not a warranty claim), ROA.23526 (Crouthamel testifying TXIT never brought a warranty claim). Accordingly, TXIT's breach of contract claim was legally invalid and never should have been submitted to the jury. Thus, the jury's answers relating to that claim should be ignored for the purposes of TXIT's irreconcilable verdict argument and its offset claim.

**III.   The district court properly awarded Polaris damages for its unpaid change orders.**

TXIT's challenges to Polaris's change order damages misrepresent both Polaris's legal burden and the jury's findings. The amounts awarded evince the jury's implicit finding that specific change orders were mutually accepted and compensable under the terms of the parties' agreements. In reaching this conclusion, the jury was required to consider the relevant contractual provisions. ROA.27738-27995 § 6.4. And it was explicitly instructed to deny Polaris damages for change orders that did not comply with these requirements, a point TXIT emphasized in closing argument. *See* ROA.28037, 40, 46, 51, 59; *see also* ROA.27808, 27810.

Federal courts presume the jury understood its task and followed its instructions. *United States v. Stanford*, 823 F.3d 814, 834 (5th Cir. 2016). And the verdict corroborates this presumption. The jury awarded substantially less damages than Polaris requested, indicating it intentionally identified the change orders it deemed compliant with the contractual requirements based on the evidence.

| Agreement | Damages sought by Polaris | Awarded Amount |
|---|---|---|
| ISBL Agreement | $11.4 million | $3,538,779.39 |
| OSBL Agreement | $7.8 million | $3,135,527.04 |
| Dock Agreement | $4.9 million | $2,087,658.03 |

ROA.17733–82.

This verdict is owed substantial deference; reversal is warranted only if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." *Kim v. Am. Honda Motor Co.*, 86 F.4th 150, 159 (5th Cir. 2023).

**A.  The jury's implicit finding that the change orders were part of the agreements is supported by legally sufficient evidence.**

Polaris presented extensive evidence supporting the jury's implicit finding that the unpaid change orders supporting the jury's award were (1) mutually agreed and (2) any compliance with procedural prerequisites was satisfied or any non-compliance excused. To disturb this finding, **TXIT** bears the burden of demonstrating that no legally insufficient evidence supports any theory that the jury could have adopted to calculate its award. *See Warner v. Talos ERT, L.L.C.*, 133 F.4th 412, 424 (5th Cir. 2025). TXIT cannot meet this burden by making generalized statements that the evidence does not support Polaris's change orders damages without identifying the specific orders challenged. Similarly, it cannot invalidate Polaris's recovery by cherry-picking individual change orders it deems unsupported by the evidence, while ignoring others that likely formed the basis for the jury's award. Because TXIT failed to meet its high burden, this Court should affirm.

**1.  Polaris's change orders were mutually agreed.**

TXIT asks the Court to invalidate the jury's finding based on its sweeping and erroneous statement that Polaris "**offered no evidence** that the Change Orders on

which it sought to recover" were consented to by TXIT. TXIT-Br. 53 (emphasis added). To the contrary, Polaris offered extensive evidence that the unpaid change orders were mutually agreed.

"[Mutual assent] is an objective inquiry, turning on what the parties said and did." *Chubb Lloyds Ins. Co. of Tex. v. Buster & Cogdell Builders, LLC*, 668 S.W.3d 145, 154 (Tex. App.—Houston [1st Dist.] 2023, no pet.). It is generally a question of fact. *Id.* While contractual signatures are probative of mutual assent, they are not required. *Phillips v. Carlton Energy Grp.*, 475 S.W.3d 265, 277 (Tex. 2015); *Mid-Continent Casualty Co. v. Global Enercom Mgmt.*, 323 S.W.3d 151, 157 (Tex. 2010). A party can also "manifest its assent by conduct, provided it intends to engage in the conduct and knows or has reason to know that the other party may infer from its conduct[] that it assents." *Chubb Lloyds*, 668 S.W.3d at 151.[10]

Here, Polaris's project manager testified that TXIT's field representatives signed off on many of the unpaid change orders. ROA.23472–73. And the jury could

---

[10] It is no defense that express contractual terms governing contract formation prevail over course of dealing. As discussed below, because the agreements' contract formation terms turned on TXIT's proper designation of an owner's representative, its failure to do so excused Polaris's compliance with those pre-requisites. "A party can implicitly waive a contract provision through its conduct, so that conduct inconsistent with one contract term will not necessarily negate that the parties mutually assented to the agreement's essential terms." *Paragon Asset Co. v. Gulf Copper & Mfg. Corp.*, 622 F. Supp. 3d 360, 414 (S.D. Tex. 2022) (citing *Stauffer Chem. Co. v. Brunson*, 380 F.2d 174 (5th Cir. 1967)).

have reasonably found mutual assent for Polaris's change orders based on TXIT's actions.

*First*, Polaris's evidence—including a summary of all change orders and their corresponding documentation, ROA.29398 (PX593)—shows that for all change orders: (1) Polaris transmitted the documentation to TXIT, (2) TXIT acknowledged the change order, (3) Polaris completed the work contemplated, and (4) TXIT accepted the work. TXIT's own employee, Dan Reynolds, testified to this effect. ROA.23796, 23801, 23803, 23816, 23820, 23821, 23822, 23827. So did Nodier. ROA.22504. Polaris's project manager also confirmed that he regularly walked the jobsite and observed that all work covered by the requested change orders was completed, "consist[ed] of valuable services and materials," and was "gladly" accepted by TXIT. ROA.23705–08. This is more than sufficient to establish contract formation or modification under Texas law. *Buxani v. Nussbaum*, 940 S.W.2d 350, 351–53 (Tex. App.—San Antonio 1997, no pet.) (court could reasonably find orally-agreed-to change orders modified construction contract when owner "allowed the items to be installed and the services to be performed without objecting to anything until the time for payment arrived").

*Second,* the record shows the parties consented to change orders worth $2,475,320 before the work began. Appendix A of the ISBL Agreement sets forth

certain "critical assumptions," and states "[t]he Contract Price and/or Schedule **will be** adjusted by Change Order per Section 6 of this Agreement should these assumptions prove to be incorrect." ROA.54546–48 (emphasis added); *see also* ROA.21209–15, 22475–76, 23471–74. Many of the unpaid orders related to discrepancies between these critical assumptions and reality. For example, discrepancies between the actual soil conditions and the presumed geotechnical data (Critical Assumption 2), as well as unforeseen underground obstructions (Critical Assumption 10), necessitated change orders 2, 5, 8, 10, 12, 15 and 31. ROA.21320, 28399, 28401–02, 23059–61, 23777–79, 23782–84, 23788–91. Additionally, the unforeseen unavailability of local utility power to support the Facility's electrical load at the times required contradicted Critical Assumption 1, necessitating change orders 17 and 24. *See* ROA.23056–59, 23774–75. Because TXIT agreed to these alterations in the contract itself, the jury reasonably could have found mutual assent. *Buxani*, 940 S.W.2d at 353 (court can reasonably find mutual assent when owner indicates to contractor "that an additional charge for the extra items would be required" and already "agreed to pay for the extra work").

*Third,* other change orders were expressly contemplated by the parties through the contractual force majeure provision. Under § 15.2 of the ISBL Agreement, TXIT agreed that "Contractor **shall be entitled** to a Change Order

adjusting the Contract Price and/or the Contract Schedule . . . to the extent Contractor incurs additional costs and expenses or delays derived from an event of Force Majeure." ROA.54526 (emphasis added); *see also* ROA.22478. Another $1,464,097 of Polaris's change orders—related to the impacts of Tropical Storms Imelda and Beta and Hurricanes Laura and Delta—undoubtedly fit the contractual definition of Force Majeure. ROA.28414 (change orders 11, 77, 78,79, 80, 81, 82, 83). Nodier testified Hurricane Laura destroyed two of Polaris's buildings in Lake Charles, damaged others, cut off power, and displaced its workers, interrupting work and driving up costs. ROA.22478–80.

*Finally*, other change orders were explicitly **requested** by TXIT. For example, TXIT required Polaris to comply with various costly COVID measures during the pandemic. ROA.22482, 23755–56, 23824–26. Polaris had to intensify its cleaning schedule, add additional facilities to maintain social distancing, and alter its methods for transporting employees, creating expensive inefficiencies. ROA.22482–87; *see also* ROA.22223–25. TXIT cannot credibly argue that it rejected the very changes it **required Polaris to undertake**.

TXIT counters that the change orders are non-compensable because many were eventually "rejected" by Sullivan (although TXIT doesn't specify which). But the contract did not require Polaris to seek Sullivan's approval; it required Polaris to

obtain approval from an owner's representative TXIT designated "as the primary point of contract for [Polaris]" within three business days of the contract's execution. ROA.54494. It is undisputed that TXIT never designated Sullivan as the owner's representative. Indeed, TXIT never complied with the requirement at all: it conceded it never notified Polaris of the designated owner's representative. ROA.27005–07. And although TXIT insisted that the identity of the owner's representative was somehow "clear" to Polaris, TXIT itself could not even consistently identify the representative throughout this litigation. ROA.27006. At trial Sullivan testified that TXIT's owner's representative was Jereme Crouthamel, directly contradicting his deposition testimony that TXIT's owner's representative was Bill Bevers. ROA.27005. Accordingly, to the extent Polaris failed to obtain approval from the "correct" TXIT employee—the owner's representative—its breach was excused by TXIT's prior material breach.

Moreover, Sullivan's "rejections" often came long after the contractually-set, three-day limit for responding to change orders.[11] ROA.54504 § 6.1(a). Nodier testified that after he obtained initial approval for change orders from TXIT field representatives, he would typically not hear anything further. ROA.21211–12. Crouthamel, a then-TXIT employee, confirmed that Polaris's submitted change orders often languished in a "parking lot" for "future discussions" after they were submitted. ROA.23474. The jury could have inferred from this conduct that TXIT's "rejections" were simply refusals to pay for previously-agreed-to work and not lack of mutual assent to the change orders themselves. Under Texas law, such a delayed rejection would be ineffective once TXIT accepted Polaris's goods and services. *Toshiba Machine Co. Am. v. SPM Flow Control, Inc.*, 180 S.W.3d 761, 772 (Tex. App.—Fort Worth 2005, pet. granted, judgm't vacated w.r.m.).

Taken together, legally sufficient evidence of mutually agreed, compensable change orders supports the amounts awarded—if not more.

---

[11] TXIT's failure to timely act on change orders also forced Polaris into the untenable choice of missing its deadlines or having to risk performing unpaid work. ROA.21216–17, 22495–96; *see also* ROA.23061 (delay in approving change orders put Polaris "between a rock and a hard place"). For example, when Polaris encountered an unanticipated underground obstruction, it either had to halt construction, thereby facing an unwanted schedule delay, or incur the risk of extensive additional costs to find a workaround—costs TXIT might refuse to pay. ROA.23061–62. And continuing work without payment had enormous ramifications for the entire project, because Polaris relied on TXIT's payments to pay its subcontractors. ROA.21217.

### 2. Polaris complied with all conditions necessary to recover its change orders damages.

TXIT is also wrong that Polaris's recovery is barred by its purported failure to comply with § 6.4's notification provisions.

*First*, legally sufficient evidence supports that Polaris's change order requests were timely. Although TXIT speaks in vague generalities, it only specifically accuses Polaris of failing to comply with § 6.4(a)'s notification requirements for the March 2020 COVID change orders. TXIT-Br. 67–68. But as discussed above, these change orders relate to changes requested by **TXIT**. ROA.22482–87. Accordingly, § 6.4 is inapplicable to the procedures governing the COVID change orders—those are covered by § 6.3. ROA.54504–05. Regardless, TXIT cannot complain of lack of notice when it was the party that requested the change orders in the first place.

Even if § 6.4 governed, it specifies no firm deadline for Polaris to provide notice of its need for change order; it just says Polaris must notify TXIT as soon as "reasonably practicable." ROA.54504. Given the exigencies of the COVID pandemic, the jury could have concluded Polaris's transmittal in February 2021 fit this definition. ROA.28418.

*Second*, any purported failure by Polaris to comply with other technical procedural requirements is irrelevant, because they were independent covenants, not conditions precedent. Texas law distinguishes between "conditions precedent"

and independent "covenants." While failure to comply with a condition precedent may preclude recovery, breach of a covenant "does not affect the enforceability of the remaining provisions of the contract unless the breach is a material or total breach." *Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 108 (Tex. 2010).

TXIT waived any argument that § 6.4's notice requirements were conditions precedent to recovering on change orders. Under Federal Rule of Civil Procedure 9(c), any denial that a "condition precedent has occurred or been performed" must be plead "with particularity." FED. R. CIV. P. 9(c). TXIT's complaint contains only a single, vague reference to conditions precedent that it fails to identify, ROA.2801, falling woefully short of Rule 9(c).

In any event, § 6.4 does not create conditions precedent. To create a condition precedent, parties must use explicit, conditional language, like "'if,' 'provided that,' 'on condition that,' or some similar phrase." *Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990). Omission of these phrases "is probative of the parties intention that a promise be made, rather than a condition imposed." *Id.*

Section 6.4 contains none of the required conditional language. Rather, it states: "Should Contractor desire to seek a Change Order . . . Contractor **shall**, with

respect to each circumstance . . . Notify Owner in writing of the existence of such circumstance as soon as reasonably practicable." ROA.54506 § 6.4(a) (emphasis added). Use of the word "shall," and other mandatory language typically "does not express a clear intention to impose a condition on [a] promise." *In re Pirani*, 824 F.3d 483, 497 (5th Cir. 2016). Accordingly, § 6.4's provisions are covenants, not conditions precedent. Any non-compliance by Polaris would not defeat its claim for unpaid change orders unless it was material. *Solar Applications*, 327 S.W.3d at 108. Because TXIT failed to request or obtain a material breach finding from the jury, its argument fails. ROA.27772–908, 27911–46.

*Finally*, even if the contractual notification provisions were conditions precedent, TXIT's own material breaches of the Agreement discussed in Part III.A.1 (failing to designate an owner's representative or adhere to the three-day response deadline) excused Polaris's compliance. *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004) (per curiam). The jury could have reasonably found that any delay resulted from the lack of a clear point of contact or TXIT's own internal delays. ROA.21192, 23401–02.

### 3. Polaris complied with the contract's dispute resolution procedures.

Finally, both procedural and substantive defects sink TXIT's argument that Polaris's failure to comply with § 19.1's contractual dispute resolution procedures precludes its change order damages.

*First*, TXIT waived this argument. Its Rule 50 motions focused on Polaris's alleged failure to comply with the dispute resolution provisions set forth in **§ 6.8**, not the separate provisions set forth in § 19.1. ROA.19934, 17547; *Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021).

*Second*, Polaris submitted evidence that it attempted to negotiate the disputed change orders in good faith with TXIT, but TXIT refused to cooperate. Nodier testified that when he attempted to meet with Sullivan to discuss disputed change orders, Sullivan refused to pay because Polaris was "his turnkey contractor and everything was, you know, [its] responsibility to fix," and refused to further negotiate in good faith. ROA.22232. Nodier further testified that he requested another dispute resolution meeting following TXIT's notice of default, but Sullivan refused to participate. ROA.22239. The jury could have easily found that Polaris satisfied its obligations under the contract, and any technical non-compliance was, again, excused by TXIT's own refusal to negotiate in good faith.

*Third*, as discussed in Part III.A.1, the jury could have found that TXIT agreed to all the change orders by knowingly accepting Polaris's work without objection. Accordingly, any "dispute" was over TXIT's failure to pay Polaris for the orders it already mutually assented to. And in this case, any failure by Polaris to comply with the dispute resolution procedures would not preclude its recovery for the change orders. Nothing in § 6.8 remotely suggests that it was a condition precedent. *See* ROA.54507. TXIT's contention that engagement in dispute resolution was a "specific condition precedent" applies only to § 19.1, not § 6.8. ROA.54507, 54534. Because § 6.8 was, at most, an independent covenant, any non-compliance would not preclude Polaris's damages.

In sum, the jury's award of change order damages is supported by the evidence and should be affirmed.

## B. Polaris was not required to prove the reasonableness of its change order damages.

TXIT also incorrectly asserts that Polaris was required to prove the reasonableness of its change orders damages. However, TXIT relies on caselaw in which the plaintiffs sought **remedial damages.** TXIT-Br. 49 (citing *McGinty v. Hennen*, 372 S.W.3d 625, 627 (Tex. 2012) (per curiam)). Remedial damages are, as the name implies, costs to repair a defective structure. *See, e.g.*, *McGinty*, 372 S.W.3d at 626 (remedial damages included "both the cost to rid the house of mold and the

cost to rebuild areas of the house affected by that remediation"); *CCC Grp., Inc. v. S. Cent. Cement, Ltd.*, 450 S.W.3d 191, 200 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (classifying future repair costs to warehouses as remedial damages); *see also Pointe W. Ctr., LLC v. It's Alive, Inc.*, 476 S.W.3d 141, (Tex. App.—Houston [1st Dist.] 2015, pet. denied).

Polaris did not seek amorphous "repair costs." Rather, it sought direct, benefit-of-the-bargain damages—the agreed-to value of its change orders, as set forth in the rate sheets included in Appendix I of the ISBL Agreement. ROA.54507 § 6.6; ROA.54563-67 (App. I); *Mays v. Pierce*, 203 S.W.3d 564, 577 (Tex. App.—Houston [14th Dist.] 2006 pet. denied). This measure of damages "is not based upon the facts as they actually occurred but instead is focused on what the injured party's economic position would have been if the contract had been fully performed." *Parkway Dental Assocs., P.A. v. Ho & Huang Props., L.P.*, 391 S.W.3d 596, 608 (Tex. App.—Houston [14th Dist.] 2012, no pet.). The calculation is straightforward—the claimant is entitled to "the difference between the value as represented and the value received." *DaimlerChrysler Motors Co. v. Manuel*, 362 S.W.3d 160, 180 (Tex. App.—Fort Worth 2012, no pet.). Because this amount is determined based on the contract itself, no additional evidence of reasonableness is required.

### C.    Regardless, ample evidence established the reasonableness of the change order damages.

Polaris would have needed to prove the reasonable value of its change orders only if the jury had concluded they were **not** covered by the agreements. In this alternative scenario—which did not occur—Polaris would have been entitled to recover under its alternative quantum meruit claims for "the reasonable value of the work performed." *Johnston v. Kruse*, 261 S.W.3d 895, 902 (Tex. App.—Dallas 2008, no pet.).

Ample evidence supported the $10,000,000 in damages awarded under this alternative standard. ROA.17774. Polaris submitted reams of documentation detailing every change order it sought, including, for example, PX593A—a compilation of thousands of pages of documents containing every change order, a summary, a cost differential, and other support, including subcontractor bid documentation. ROA.28398. And Nodier, who prepared the change orders, expressly testified about the underlying work and the reasonableness of the amounts sought. He opined, for example, that the change orders, milestones, and other unpaid work "add[] up to a total of . . . $39,443,830," which represents "the reasonable value of the work at the time and place it was performed [and] for which Polaris has not received payment." ROA.22228.

This is more than sufficient under this Court's precedent, which permits company owners or financial officers to testify as lay witnesses about financial losses based on their knowledge of their business. *Meaux Surface Protection, Inc. v. Fogleman*, 607 F.3d 161, 168–69 (5th Cir. 2010); *accord* FED. R. EVID. 701 advisory committee's note to 2000 amendments ("[M]ost courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an . . . expert."). The same is true under Texas law. *See, e.g., Toshiba Mach. Co., Am. v. SPM Flow Control, Inc.*, 180 S.W.3d 761, 778–79 (Tex. App.—Fort Worth 2005, pet. granted, judgm't vacated w.r.m.); *Sw. Bell Med. Inc. v. Lyles*, 825 S.W.2d 488, 499–500 (Tex. App.—Houston [1st Dist.] 1992, writ denied); *Anthony Equip. Corp. v. Irwin Steel Erectors, Inc.*, 115 S.W.3d 191, 204 (Tex. App.—Dallas 2003, pet' dism'd) (same). TXIT is simply incorrect that expert testimony was required—indeed, the law is the exact opposite. *Johnston*, 261 S.W.3d at 902 ("Reasonable value may be established through lay testimony"); *see also Lamajak, Inc. v. Frazin*, 230 S.W.3d 786, 796 (Tex. App.— Dallas 2007, no pet.) (holding that plaintiff company CEO and President's lay testimony about general value of his compensation was competent evidence of quantum meruit damages).

None of TXIT's authorities contradict this well-settled precedent. TXIT relies on a series of tort cases that address the evidence required to establish causation or negligence for highly technical product liability claims. None of these decisions involve breach of contract (or quantum meruit) claims or even opine on the evidence needed to establish the **reasonable value** of labor and materials. And all involve distinguishable, complex fact issues distinct from those presented here. *See, e.g.*, *FFE Transp. Servs., Inc. v. Fulgham*, 154 S.W.3d 84, 91 (Tex. 2004) (addressing the evidence required to prove a "complex causation theory" involving a design defect in "specialized equipment" that "[f]ew people not involved in the trucking industry are familiar with"); *Smith v. Chrysler Grp., L.L.C.*, 909 F.3d 744, 751 (5th Cir. 2018) (addressing the evidence required to prove whether technical design defects in a Jeep caused an engine fire); *Simmons v. Briggs Equip. Transp.*, 221 S.W.3d 109, 114 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (similar, involving rail car fire).

In contrast to TXIT's cases, Nodier was amply qualified to discuss the costs and profit margins of his own business. He testified that he prepared the bids for nearly every job Polaris has done for the last three decades. ROA.24304–05. He is intimately familiar with Polaris's labor and material pricing for various scopes and types of work, along with the indirect costs, risks and contingencies built into the

pricing of that work. Therefore, any objection to his testimony at most goes to its weight, not its sufficiency.

Accordingly, Polaris's evidence was sufficient to support the damages awarded under either its contract or quantum meruit theories.

### D. Polaris's evidence was legally sufficient to recover on its alternative quantum meruit claim.

Because the jury implicitly found the amounts awarded were covered by the parties' contracts, the district court properly awarded Polaris its damages under its change orders claims, not its quantum meruit claim. But if this Court reverses the breach of contract award, Polaris is entitled to the $10,000,000 in damages on its quantum meruit claim for the "reasonable value of such compensable work." ROA.17774.

It is black letter law that "[w]hen a contractor under a building or construction contract breaches the contract and the owner accepts and retains the benefits arising as a direct result of the contractor's partial performance," the existence of an express contract **will not bar** the contractor's quantum meruit claim. *Bluelinx Corp. v. Tex. Constr. Sys., Inc.*, 363 S.W.3d 623, 629 (Tex. App.—Houston [14th Dist.] 2011, no pet.).

TXIT is wrong that this renders the contractual provisions meaningless. It simply recognizes the equitable principle that "if the defendant were permitted to

retain the benefits of the partial performance without paying anything in return," then the defendant would be "unjustly enriched and the plaintiff would be unjustly penalized." *Truly v. Austin*, 744 S.W.2d 934, 938 (Tex. 1988).

Based on the jury's explicit finding, Polaris expended labor and materials approximating $10,000,000 to construct a Facility that TXIT ultimately retained and profits from today. It is only fair that Polaris receive some compensation for the extensive time and resources it expended, regardless of whether it strictly complied with the contract's procedures.

TXIT's caselaw does not hold otherwise. *Summit Global Contractors, Inc. v. Enbridge Energy, Ltd. Partnership*, 594 S.W.3d 693 (Tex. App.—Houston [14th Dist.] 2019, no pet.) makes no mention of the settled exception mentioned above, indicating the plaintiff likely failed to assert it. Even if the exception applied, the plaintiff's claim independently failed because it did not provide legally sufficient evidence establishing damages. *Id.* at 702. For the reasons discussed above, this was not true for Polaris.

Polaris's change orders damages are amply supported by the evidence, and the Court should affirm the award in its entirety.

IV.    **The awards to Polaris should be upheld in full.**

A.    **TXIT is not entitled to an $18.8 million offset.**

1.    **TXIT failed to preserve or conclusively establish its belated continuing performance theory.**

The district court correctly declined to award TXIT damages under the ISBL Agreement because the jury found TXIT committed the first material breach of that agreement. ROA.17746. "A fundamental principle of contract law is that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from any obligation to perform." *O'Brien's Response Mgmt., L.L.C. v. BP Expl. & Prod., Inc.*, 24 F.4th 422, 434 (5th Cir. 2022). TXIT once again tries to evade the jury's prior material breach finding, this time by arguing that Polaris "undisputably" treated the ISBL Agreement as continuing through its termination date and, therefore, was not excused from further performance. TXIT-Br.60. Its argument is both procedurally waived and substantively meritless.

TXIT failed to raise this issue **at any time** before the submission of this case to the jury. "A claimant who bears the burden of proof and who believes that he is entitled to judgment as a matter of law, is . . . obliged to move for judgment as a matter of **law before the case is submitted to the jury.**" *U.S. for use of Wallace v. Flintco Inc.,* 143 F.3d 955, 968 (5th Cir. 1998) (emphasis added). TXIT did not move for judgment as a matter of law under Rule 50(a) on this point, nor did it request a

jury finding on continuing performance. ROA.17538-76, 17578-97; *see also Newberry v. E. Tex. State Univ.*, 161 F.3d 276, 281 (5th Cir. 1998) (claims not submitted to the jury are waived on appeal). Accordingly, TXIT waived its continuing performance theory.[12]

It also lacks merit. Because TXIT failed to preserve the issue, this Court reviews only for plain error. *Flintco Inc.,* 143 F.3d at 968. And even if TXIT had preserved the issue (which it did not), TXIT still would have been required to show that it "conclusively established" all the elements of its continuing performance theory "with evidence that the jury [could] not reject." *Id.* at 964. TXIT ignores these onerous legal standards and cannot meet either of them. TXIT-Br.59.

TXIT's brief does not include a single citation to **any evidence**. TXIT-Br.58-59. TXIT cites only the verdict form, wherein the jury awarded Polaris damages for unpaid work performed prior to January 4, 2021, the date TXIT formally terminated the ISBL Agreement. *See* TXIT-Br. 58-60; ROA.17750, 50375-76. Needless to say, the fact that the jury awarded Polaris damages for work performed under the contract

---

[12] TXIT's omission is made even more glaring by the fact that Polaris submitted a defensive jury question on continuing performance. ROA.17747. TXIT knowingly chose not to do the same. TXIT attempted to raise this issue in a Rule 59(e) motion, but by then it was too late. *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 486 n.5 (2008) (Rule 59(e) "may not be used . . . to raise arguments or present evidence that could have been raised prior to the entry of judgment.").

sometime between the contract's effective date and its termination date is no evidence—much less conclusive evidence—that Polaris continued performing *after* TXIT's material breach. Nor is it any evidence of plain error.

Quite the opposite. After TXIT achieved "stable operations," it should have given Polaris the opportunity to performance test. ROA.54515 § 10.4(c). But instead, TXIT "blocked" Polaris from ever conducting performance testing. ROA.17740, 22902. Thus, far from conclusively establishing that Polaris continued to perform, the evidence shows Polaris was prevented from performing.

> ### 2. Numerous other legal obstacles preclude any offset or recovery for TXIT's ISBL breach claim.

The Court can affirm the district court's refusal to award TXIT offset damages for its ISBL breach claim on any number of alternative grounds. *See generally* ROA.20044-63, 20896-916; *United States v. Real Prop. Located at 14301 Gateway Blvd. W., El Paso Cnty. Tex.*, 123 F.3d 312, 313 (5th Cir. 1997) (per curiam) ("[W]e will not reverse a judgment of the district court if it can be affirmed on any ground, regardless of whether the district court articulated the ground.").

*First*, because TXIT accepted the Facility, its claims about the ISBL Agreement could have sounded only in warranty, not contract, and Q5 should not even have been submitted. *Supra* Part II.C.

*Second*, the jury's award of retrofit costs rested on a legally erroneous measure of damages. Where, as here, an owner claims that a contractor has not substantially complied with the contract terms—i.e., that the contractor committed a material breach—the correct measure of damages is the "difference between the value of the building as constructed and its value had it been constructed in accordance with the contract." *Turner, Collie & Braden, Inc. v. Brookhollow, Inc.*, 642 S.W.2d 160, 164 (Tex. 1982). Remedial damages, such as retrofit costs, are unrecoverable. *Id.; Hutson v. Chambless*, 300 S.W.2d 943, 945 (Tex. 1957). It is undisputed that TXIT submitted no proof under the proper measure.[13]

*Third*, over Polaris's objection (ROA.28166), the district court injected a legally invalid breach theory into the ISBL breach question—specifically TXIT's unpled, mid-trial theory that Polaris breached performance guarantees related to

---

[13] TXIT claims that § 16.2 of the ISBL Agreement overrides this authority because, upon a contractor default, it permits TXIT to enter the Facility and "either itself or through others complete the Work." ROA.54529–30 § 16.2. But the agreement distinguishes between the completion of unfinished work, governed by § 16.2, and the "correction of work" already performed, governed by the exclusive warranty provisions in § 13.3. ROA.54523–24, 54529–30 §§ 13.3, 16.2. Polaris constructed and delivered a Facility that was certified mechanically complete in May 2020. ROA.8091–97. So TXIT's massive retrofit was at best an attempt to correct Polaris's work under § 13.3. Yet TXIT cannot recover under that provision because it never brought a warranty claim. ROA.23526.

non-Table 1 crudes—a theory that defies the relevant contractual language,[14] misapplies the incorporation-by-reference doctrine,[15] contradicts TXIT's judicial admissions,[16] was barred by judicial estoppel,[17] and was unsupported by the evidence.[18] ROA.20051-55, 20909-12.

---

[14] The ISBL Agreement states that the "performance guarantee is limited to the processing of crude oil conforming to the properties cited in Table 1 below." ROA.54559. The contract itself excludes the FEL-2 Report from the scope of work. The first paragraph of Appendix A makes clear that "Sections 1, 2, 3 and 4 [of the ISBL Agreement] comprise the Work." ROA.54547, 54492 (definition of the "Work").

[15] The ISBL Agreement's "mere reference" to the FEL-2 Report in an appendix, ROA.54544, which does not plainly state that the parties intended to be bound by all the terms of the report, is insufficient, as a matter of law, to establish incorporation-by-reference. *Bob Montgomery Chevrolet, Inc. v. Dent Zone Cos.*, 409 S.W.3d 181, 189 (Tex. App.—Dallas 2013, no pet.) ("The language in the signed document must show the parties intended for the other document to become part of the agreement."); *Tribble & Stephens Co. v. RGM Constructors, L.P.*, 154 S.W.3d 639, 665 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) ("A mere reference to another document is insufficient to establish a wholesale incorporation of the referenced document.").

[16] TXIT argued that any promises relating to non-Table 1 crude were "entirely outside of [ISBL Agreement's] scope" in resisting summary judgment on its promissory estoppel claim. ROA.34128.

[17] The district court adopted the above argument in partially denying Polaris's motion for summary judgment, holding that GCC's promissory estoppel claim survived because it was based on "promises about crude" that were "outside of the contract's scope." ROA.8101–02.

[18] The FEL-2 Report is an informational study; it does not contain any enforceable promises or performance guarantees. ROA.54544.

Space constraints preclude Polaris from fully briefing additional alternative grounds for affirmance.[19] Should TXIT's claim somehow survive all the arguments above, this Court can remand to permit the district court to address these arguments in the first instance. *See E.E.O.C. v. Simbaki, Ltd.*, 767 F.3d 475, 485 (5th Cir. 2014).

**B.    The district court correctly awarded prejudgment interest.**

**1.    The contracts do not waive prejudgment interest.**

TXIT's assertion that § 12.3's consequential damages limitation bars prejudgment interest fails for three reasons.

*First*, TXIT failed to timely raise this issue. Although Polaris requested prejudgment interest in its motion for entry of judgment, TXIT never argued that § 12.3 barred such an award. ROA.17785-86, 17805-35. TXIT belatedly attempted to raise this issue in a Rule 59(e) motion, but Rule 59(e) "may not be used . . . to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Baker*, 554 U.S. at 486 n.5 (2008).

---

[19] Among the other grounds are: (1) TXIT's claim rested on a patently unreasonable interpretation of the contract, ROA.20049-51, 20907-08; and (2) that TXIT's claimed damages are legally defective, contain improper elements, and are subject to a contractual cap of 10% of the contract price, ROA.20055-63, 20912-16.

*Second*, TXIT's construction of § 12.3 is unreasonable as a matter of law. Under the canon known as *noscitur a sociis*, a word or phrase in a group is given a meaning consistent with its companion words. *Flagship Credit Corp. v. Indian Harbor Ins. Co.*, 481 F. App'x 907, 911 (5th Cir. 2012) (per curiam) (applying Texas law). Here, every example of damages barred by § 12.3 relates in some way to the Facility. ROA.54521 § 12.3. For instance, § 12.3 lists "losses or damages caused by reason of unavailability of the Facility, shutdowns or service interruptions, loss of use, loss of profits or revenues, inventory or use charges" and so on. ROA.54521. Accordingly, read in context, the phrase "loss of use" in § 12.3 plainly refers to damages arising from loss of use **of the Facility**—not "loss of use" of money. ROA.54521. TXIT's contrary interpretation is unreasonable because it would create an irreconcilable conflict with § 8.7, which expressly provides for prejudgment interest on unpaid amounts. *See* ROA.54510 § 8.7; *Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 148 (Tex. 2020) (contracts should be construed to harmonize their provisions and avoid conflicts).

*Third*, under Texas law, prejudgment interest awards are not "damages" at all and, thus, not barred by consequential damages provisions like § 12.3. "The term 'interest' encompasses two distinct forms of compensation: interest as interest (eo nomine) and interest as damages." *In re Xerox Corp.,* 555 S.W.3d 518, 531 n.71

(Tex. 2018). When, as here, interest is awarded by statute (the Prompt Payment Act) and contract, it falls into the "interest as interest" category—not interest as damages *Id.* Indeed, TXIT has previously conceded that the award of prejudgment interest in this case is not "damages" under Texas law. ROA.20085 (arguing that, for purposes of calculating a supersedeas bond, "prejudgment interest is not damages").

In short, TXIT's argument that the prejudgment interest award is barred by the contract is substantively erroneous (and waived) and should be rejected.

> ### 2.    The district court properly awarded prejudgment interest under the Texas Prompt Payment Act.

The district court correctly awarded Polaris prejudgment interest at a 1.5% per month rate under the Texas Prompt Payment Act ("the Act"). *See* Tex. Prop. Code § 28.004. The Act addresses "prompt payments to contractors" for "work properly performed" under a contract and states that any unpaid amount "bears interest at the rate of 1 ½ percent each month." *Id.* § 28.002(a), 28.004(b).

TXIT argues that the Act does not apply because Polaris's work was not "properly performed." TXIT-Br. 63. But that was a disputed fact issue that the jury decided in Polaris's favor by awarding it $3.5 million for unpaid change orders and $2.7 million for additional work performed under the ISBL Agreement. ROA.17750. TXIT points to the jury's finding that Polaris failed to comply with the Performance

Guarantees, but TXIT fails to mention that the jury also found that such failure was excused by TXIT's prior material breach. ROA.17746.

TXIT also attempts to invoke the Act's "good faith dispute" exception, to no avail. TXIT-Br. 63. At best, the exception allows an owner to "withhold prompt payment in the event of a good faith dispute," but "**it does not exempt this withheld amount from accruing interest if the withholding party is ultimately found to be at fault for the breach**." *Patel v. Creation Constr., Inc.*, 2013 WL 1277874, at *3 (Tex. App.—Dallas Feb. 27, 2013, no pet.) (mem. op.) (emphasis added); *accord D2 Excavating, Inc. v. Thompson Thrift Constr., Inc.*, 2021 WL 3144539, at *4 (S.D. Tex. July 26, 2021), *aff'd*, 2023 WL 3562992 (5th Cir. May 19, 2023); *Landmark Org., L.P. v. Delphini Constr. Co.*, 2005 WL 2560022, at *5 (Tex. App.—Corpus Christi–Edinburg Oct. 13, 2005, pet. denied) (mem. op.); *Levco Constr., Inc. v. Whole Foods Mkt. Rocky Mountain/Sw. L.P.*, 549 S.W.3d 618, 646 (Tex. App.—Houston [1st Dist.] 2017, no pet.). TXIT cites no contrary authority. TXIT-Br. 63 (citing *RAJ Partners, Ltd. v. Darco Constr. Corp.*, 217 S.W.3d 638, 646 (Tex. App.—Amarillo 2006, no pet.) (holding that the trial court properly awarded prejudgment interest of 18% under the Prompt Payment Act).)

TXIT has shown no error in the district court's award of prejudgment interest and that award should be affirmed.

## V.    Conditional cross-point: The district court improperly rejected Polaris's lost profits claim.

Polaris lost tens of millions of dollars in profits on eight contracts it bid for and won, but could not perform, because TXIT's claim on Westchester's surety bond prevented Polaris from obtaining the necessary bonds. ROA.24293-316. The district court granted TXIT's Rule 50(a) motion on this claim, ROA.24794, based on its view that lost profits were barred by the ISBL Agreement's consequential damages waiver and could not be overcome by a showing of bad faith. ROA.24905, 25112, 24796. If the Court grants TXIT's request for a new trial, the Court should instruct the district court to permit Polaris's lost profits claim to be decided by the jury.

The issue—raised multiple times below and as a conditional new trial point in Polaris's post-judgment briefing, ROA.20064-71, 20916-18, 17095, 17120—turns on the proper reading of the Texas Supreme Court's decision in *Zachry Construction Corp. v. Port of Houston Authority of Harris County*, 449 S.W.3d 98, 116–18 (Tex. 2014). The decision set forth a broad, categorical, and unqualified rule that pre-injury waivers of contract liability for intentional, bad faith conduct are unenforceable. But TXIT persuaded the district court to improperly limit *Zachry* to the facts of that case, which involved a no-delay-damages provision. ROA.25112.

The district court nevertheless agreed the issue was close (having wavered during pre-trial and trial) and important enough to potentially warrant certification

to the Texas Supreme Court. In fact, the district court stated: "I don't think the Fifth Circuit will rule on this without sending it as a certified question to the Supreme Court. I think it's too big an issue, and it's too big a case." ROA.25112. Consistent with the district court's instincts, should the Court grant a new trial, Polaris requests certification of the district court's lost profits ruling to the Texas Supreme Court. Alternatively, this Court should reach the issue and determine that Polaris's lost profits claim should be reinstated in any new trial, and instruct the district court accordingly.

The district court's ruling violated this Court's holding that it is the policy rationales of state supreme court decisions—as opposed to their factual specificities—that should guide an *Erie* guess. *See Harris Cnty. Water Control & Improvement Dist. No. 89 v. Phila. Indem. Ins. Co.*, 31 F.4th 305, 309 (5th Cir. 2022). When a state supreme court has articulated a legal rule in "categorical language," it is deemed to have clearly spoken. *See Mem'l Hermann Healthcare Sys. Inc. v. Eurocopter Deutschland, GMBH*, 524 F.3d 676, 678 (5th Cir. 2008).

In *Zachry*, the Texas Supreme Court articulated the following general, categorical rule: "Generally, a contractual provision 'exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy.' We think the same may be said of contract liability." 449 S.W.3d at

116. Based on this categorical, unambiguous language, the district court erred in ruling that *Zachry* did not apply here.

Indeed, numerous other Texas courts have extended *Zachry* beyond the delay-damages context. *See, e.g., Brennan v. Kaufman,* 2021 WL 3729257, at *5–6 (Tex. App.—Houston [14th Dist.] Aug. 24, 2021, pet. denied) (mem. op.) (applying *Zachry* to invalidate a broad-form release of tort liability); *Armstrong v. Curves Int'l, Inc.*, 2017 WL 894437, at *12 (W.D. Tex. Mar. 6, 2017) (construing *Zachry* as holding broadly that "pre-injury waivers of future contract liability for harm caused intentionally or recklessly [are] unenforceable on grounds of public policy"); *see also, e.g., Dishon v. Lonesome Creek Resort, LLC*, 2024 WL 4526088, at *12–13 (N.D. Tex. Aug. 5, 2024); *Riley v. Bank of N.Y. Mellon as Tr. for Certificateholders of CW ABS Inc. , Asset-Backed Certificates, Series 2004-5*, 2025 WL 919925, at *7-8 (Tex. App.—Beaumont Mar. 27, 2025, no. pet.); *Hill v. Fitness Int'l, LLC*, 2023 WL 2607646, at *8 (Tex. App.—Fort Worth Mar. 23, 2023, no pet.) (mem. op.); *Bachtell Enters., LLC v. Ankor E&P Holdings Corp.*, 651 S.W.3d 514, 522 (Tex. App.—Houston [14th Dist.] 2022, pet. denied); *McCloskey v. Clubs of Cordillera Ranch, LP*, 2017 WL 6502444, at *3 (Tex. App.—San Antonio Dec. 20, 2017, no pet.) (mem. op.). The Texas Supreme Court would likely do the same.

TXIT may argue that the exclusion of these damages is justified on grounds not reached by the district court, but it would be wrong. As indicated by TXIT's pretextual economic motivations, shifting positions and deliberate misrepresentations to Polaris, there was ample evidence of TXIT's bad faith to go to the jury. ROA.24571-80 (summarizing bad faith evidence); ROA20066-69 (same). There was also ample evidence that TXIT's misconduct was the cause of Polaris's inability to secure performance bonds on other projects for which it had prevailed in the bidding —including TXIT's September 2020 default letter sent to Westchester and shared with other sureties, in which TXIT improperly attempted to revoke its certification of mechanical completion and denied that stable operations had been achieved (positions rejected by the district court on summary judgment). ROA.62144-48, 22518, 22524-53, 24500-03, 23907, 24492–93. And because Polaris's contracts were agreed to on a lump-sum basis, the profits it would have made but for TXIT's misconduct were reasonably known in advance. ROA.24300–07. If this case is to be retried, the jury should be allowed to assess whether Polaris's harm from TXIT's intentional, bad faith conduct is remediable.

## CROSS-APPEAL ARGUMENT

**VI.  The district court erred as a matter of law in denying Polaris's request for attorneys' fees.**

Section 38.001 of the Texas Civil Practice and Remedies Code mandates an award of attorneys' fees and expenses to a party that prevails on a breach of contract claim against an "individual" or a "corporation." CPRC § 38.001 (2020 version).[20] The trial court has "no discretion" to deny a prevailing party's fee request under this provision. *Ventling v. Johnson*, 466 S.W.3d 143, 154 (Tex. 2015).

Section 38.001 applies here because TXIT expressly represented and warranted in the governing contracts that it was a Texas "corporation." ROA.41446, 41549, 41643. The district court thus erred as a matter of law in denying Polaris fees on the grounds that TXIT is actually a limited partnership. ROA.21076-83.

**A.  Under the doctrine of "estoppel by contract," TXIT is bound by its representations and warranties that it is a Texas corporation.**

The ISBL, OSBL, and Dock Agreements each contain an identical provision in which TXIT expressly "represents and warrants" that: "It is a **corporation** duly

---

[20] The Texas Legislature amended § 38.001, effective September 1, 2021, but the amendment does not apply to actions, like this one, commenced before its effective date. *See* 2021 Tex. Sess. Law Serv. Ch. 665 (H.B. 1578).

organized and validly existing under the laws of Texas." ROA.41446, 41549, 41643 (emphasis added). The full provision is below:

> **Article XVIII**
> **OWNER REPRESENTATIONS AND WARRANTIES**
>
> Owner represents and warrants to Contractor that:
>
> **Section 18.1    Organization and Qualification.**  It is a corporation duly organized and validly existing under the laws of Texas. It has all necessary power and authority to carry on its business as presently conducted, to own or hold its properties, and to enter into and perform its obligations under this Agreement.

ROA.41549. This representation is consistent with TXIT's identification of itself in the contracts as "Texas International Terminals, **Ltd.**" ROA.41391, 41497, 41591; *see* Tex. Bus. Org. Code § 5.054 (the name of a "corporation" must contain the word "company," "corporation," "incorporated," or "limited").

TXIT is bound by its contractual representations and warranties under the doctrine of estoppel by contract. Under this doctrine, "a party to a contract cannot, to the prejudice of another, take a position inconsistent with the contract's provisions." *Freezia v. IS Storage Venture, LLC*, 474 S.W.3d 379, 387-88 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *Eckland Consultants, Inc. v. Ryder, Stilwell Inc.*, 176 S.W.3d 80, 87 (Tex. App.—Houston [1st Dist.] 2004, no pet.).

Unlike other forms of estoppel, estoppel by contract "requires no showing of misrepresentation or of detrimental reliance." *Eckland*, 176 S.W.3d at 87. Rather, it rests on the premise that it would be "unconscionable" to allow a party to accept the

benefits of a contract and then later take "an inconsistent position to avoid corresponding obligations or effects." *Freezia*, 474 S.W.3d at 387. It is a corollary of the well-established principle that sophisticated parties represented in complex commercial transactions by able counsel are held to the terms of their bargain. *Id.*

Here too, it would be unconscionable—and contrary to Texas law—to allow TXIT to accept the benefits of its contracts and now "cherry pick" certain contractual terms it no longer wishes to honor. *Freezia*, 474 S.W.3d at 387; *cf. Fed. Ins. Co. v. Singing River Health Sys.*, 850 F.3d 187, 198 n.5 (5th Cir. 2017). Contractual representations would be meaningless if they could be discarded at will.

In short, because TXIT represented and warranted it was a Texas corporation, TXIT is now estopped by contract from arguing otherwise and the district court erred in denying Polaris's request for fees under CPRC § 38.001.

### B.    The district court erred in permitting TXIT to evade its contractual representations and warranties.

By failing to hold TXIT to its representations, the district court effectively struck those terms from the parties' contracts. In doing so, it violated the Texas Supreme Court's admonition that "courts cannot rewrite the parties' contract or add to or subtract from its language." *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 770 (Tex. 2018). The district court reasoned that TXIT was a limited partnership, "not a corporation, and sloppy contract language won't turn it into one."

ROA.21078-79. But that reasoning conflicts with this Court's holding in *Al-Saud v. Youtoo Media, L.P.*, 754 F. App'x 246, 253 (5th Cir. 2018) that courts should not look beyond the four corners of the parties' contracts.

In *Al-Saud*, a limited partnership entered into an agreement signed by its CEO, Chris Wyatt, who the contract described as a "General Partner." *Id.* at 249. The registration documents on file with the Texas Secretary of State later revealed that representation to be false, indicating that a third-party—not Wyatt—was the general partner. *Id.* Nonetheless, after a jury found that the limited partnership breached its agreement, the district court held that Wyatt, because he was listed in the parties' contract as the General Partner, was derivatively liable for the partnership's debts under the Business Organizations Code. *Id.* at 251.

Wyatt argued that it was "undisputed and undeniable" that he was not the General Partner and, therefore, could not be held derivatively liable. *Id.* This Court disagreed: "We have no reason to doubt that the state records would show what Wyatt claims they would. But that alone is not enough to allow its consideration. Courts, when interpreting contracts, are generally limited to the four corners of the document." *Id.* This Court reasoned that "[a] counterparty who deals with a limited partner takes into account the financial status of the general partner when determining what terms it will accept. Without the general partner, the terms of the

contract might be different." *Id*. at 252. It thus held that it must "enforc[e] the contract the parties signed." *Id*. at 253.

Here, as in *Al-Saud*, the district court was limited to the four corners of the parties' agreements and should not have looked to TXIT's extrinsic registration documents to determine its liability under § 38.001. But for TXIT's representations and warranties, Polaris would have bargained for a contractual fees provision. Indeed, Polaris bargained for such a provision in the separate OSBL Engineering Agreement—the only contract between the parties in which TXIT did not represent that it was a Texas corporation. ROA.54680, § 5. Accordingly, as in *Al-Saud*, the district court erred in failing to enforce the parties' contracts as written.

Finally, this Court observed in *Al-Saud* that there are certain equitable exceptions to the bar on extrinsic evidence, including the doctrine of mutual and unilateral mistake, which might have allowed the trial court to reform the contract. 754 F. App'x at 252. It noted, however, that Wyatt had not timely raised any of those defenses. *Id*. Similarly, TXIT did not plead or attempt to prove the elements of mistake in opposition to Polaris's motion for attorneys' fees. ROA.20511-38, 20857-61. The district court therefore had no grounds to reform the contract by striking TXIT's representations and warranties from its terms.

This Court should reverse the district court's order denying Polaris's motion for attorneys' fees and expenses under Section 38.001 and remand for entry of a fee award, including all reasonable fees incurred in this appeal.

## VII. Because TXIT's conversion claim fails as a matter of law, this Court should vacate the $1 million offset associated with that claim.

The district court erred in declining to grant judgment as a matter of law on TXIT's conversion claim. TXIT failed to prove that it owned the equipment at issue or to present any competent evidence of damages.

### A.     TXIT failed to prove ownership of the disputed equipment.

To recover for conversion, TXIT was required to prove ownership of the disputed equipment. *See Arthur W. Tifford, PA v. Tandem Energy Corp.*, 562 F.3d 699, 705 (5th Cir. 2009) (applying Texas law). It did not do so. Under the plain terms of the Dock Agreement, title to the equipment—two gangways that were to be used to facilitate boarding and disembarking from vessels—never passed to TXIT.

Section 14.2 of the Dock Agreement states: "Equitable title to . . . Work and Equipment provided by Contractor [Polaris] or Subcontractors hereunder will pass to Owner [TXIT] as and to the extent payment therefor is made by Owner [TXIT] in accordance with this Agreement." ROA.54732 § 14.2. The contract does not provide a line item price for each piece of work and equipment but rather states that

the contract is for a "**fixed, lump sum price**," which began at $40 million and was increased by several change orders. ROA.54718 § 7.1 (emphasis added).

Under a fixed-price contract, nothing is paid for fully until the entire price is paid. *See* BLACK'S LAW DICTIONARY (12th ed. 2024) (defining a "lump-sum contract" as one "setting a fixed total price for a construction project"); *cf. Arrow Field Servs., LLC v. Linde Eng'g N. Am., Inc.*, 710 S.W.3d 856, 864 (Tex. App.—Houston [1st Dist.] 2024, pet. filed) (contrasting a "lump sum contract" with a "cost reimbursable contract"). TXIT did not pay the full, lump sum price. ROA.17770. Thus, under the plain terms of the Dock Agreement, TXIT never obtained title to the disputed equipment and its conversion claim fails as a matter of law.

TXIT persuaded the district court that the contract was ambiguous, but there is only one reasonable interpretation here. ROA.17775-76. TXIT relied on Appendix B, which contained a "Progress Payment Schedule" specifying that the lump-sum contract price would be paid in eight installments, each contingent upon Polaris hitting certain "Operational Milestone Indications." ROA.54757.

Appendix B is shown below for ease of reference:

**APPENDIX B: PROGRESS PAYMENT SCHEDULE**

| Payment Number | Percent Contract Price | Progress Payment | Payment, USD | Operational Milestone Indications |
|---|---|---|---|---|
| 1 | 20% | December 11, 2019 | 8,063,466.20 | • Begin Engineering<br>• Procure Materials<br>• Begin Shop Fabrication<br>• Order Equipment |
| 2 | 20% | February 5th, 2020 | 8,063,466.20 | • Engineering 35%<br>• Mobilize to field<br>• Shop Fabrication 35% |
| 3 | 20% | April 3, 2020 | 8,063,466.20 | • Engineering 70%<br>• Field Installation 25%<br>• Shop Fabrication 90%<br>• Equipment Payments 50% |
| 4 | 15% | May 28, 2020 | 6,047,599.65 | • Engineering 100%<br>• Field Installation 50%<br>• Shop Fabrication 100% |
| 5 | 15.5% | July 24, 2019 | 6,249,186.31 | • Field Installation 75%<br>• Shop Fabrication 100%<br>• Equipment Payments 100% |
| 6 | 4.5% | Mechanical Completion | 1,814,279.90 | • Mechanical Completion Achieved |
| 7 | 4.5% | Substantial Completion | 1,814,279.90 | • Substantial Completion Achieved |
| 8 | .5% | Final Completion | 201,586.66 | • Final Completion Achieved |
|  | 100% | Contract Price | $40,317,331.00 |  |

ROA.54757.

TXIT seized upon Progress Payment No. 5, which listed one of the operational milestones as "Equipment Payments 100%." ROA.54757. TXIT argued that the reference to "Equipment Payments 100%" was "an indication of what TXIT had paid for." ROA.17776. TXIT claimed that because it had "fully paid" Progress

Payments 4 and 5, it had paid Polaris for all the equipment and, thus, obtained title to it. ROA.17776. Not so.

*First*, the jury rejected TXIT's argument. The jury awarded Polaris nearly $1.4 million in amounts due under Progress Payments 4 and 5. ROA.17770. So even under TXIT's own interpretation of Appendix B, TXIT's failure to pay Progress Payments 4 and 5 in full means that title to the disputed equipment never passed to TXIT.

*Second*, TXIT's interpretation of Appendix B is erroneous as a matter of law. "Texas courts apply canons of construction prior to deciding whether a term is ambiguous." *Flagship Credit Corp.*, 481 F. App'x at 911 (citing *Italian Cowboy Partners, Ltd.*, 341 S.W.3d at 333). As previously mentioned, under the *noscitur a sociis* canon, a word or phrase in a group is given a meaning consistent with its companion words. *Id.* at 911; *see also Finley Res., Inc. v. Headington Royalty Inc.*, 672 S.W.3d 332, 343 & n.42 (Tex. 2023).

All the bulleted phrases listed in the "Operational Milestone Indications" refer to operational goals Polaris had to achieve before it was entitled to receive Progress Payment 5. For example, only Polaris (as the general contractor)—not TXIT (as the owner)—could achieve "Field Installation 75%" or "Shop Fabrication 100%." ROA.41468. Construing the phrase "Equipment Payments 100%" in a manner consistent with its companion phrases, it unambiguously refers to Polaris's

obligation to pay its own equipment vendors in full (ensuring they would not file liens on the Facility). It **does not** mean that TXIT had paid Polaris in full for all the equipment. *See also* ROA.54509 § 8.3 (referring to the "list of all Milestone Indications **that Contractor [Polaris] has completed**. . .")

This interpretation is also consistent with the prevailing case law, which views "provisions for progress payments in building or construction contracts as being designed for the convenience of the contractor, by providing him with funds from time to time as the work progresses, . . . **rather than as being intended to apportion the consideration into parts precisely equivalent to corresponding parts of the construction work**." C.T. Foster, *Building or Construction Contract Providing for Installment or "Progress" Payments as Entire or Divisible*, 22 A.L.R.2d 1343 (2025); *see also Bartlett v. Bisbey*, 66 S.W. 70, 72 (Tex. Civ. App. [1st Dist.] 1901, writ ref'd).

Construing Appendix B in a manner that suggests that it was apportioning the contract price to specific equipment and services would directly conflict with § 7.1, which again states that the contract is for a "fixed, **lump sum** price." ROA.54718 § 7.1 (emphasis added). Texas courts construe contracts to avoid conflicts—a principle that the parties endorsed in the terms of the Dock Agreement itself. *See Mosaic Baybrook One, L.P. v. Simien*, 674 S.W.3d 234, 257 (Tex. 2023); ROA.54702 § 2.3. And even assuming there was an irreconcilable conflict (which there is not),

§ 7.1 would control as a matter of law over Appendix B. ROA.54747 § 24.10 (body of the contract controls over appendices if they conflict).

In short, the Dock Agreement is unambiguous, and the district court erred in submitting its interpretation to the jury. Once properly construed, TXIT's conversion claim fails as matter of law.

### B.     TXIT failed to offer legally sufficient evidence of damages.

TXIT's conversion claim also fails as a matter of law because TXIT offered no competent evidence of the market value of the disputed equipment. ROA.17777 (instructing the jury to award "market value" damages).

Under Texas law, testimony regarding market value "cannot be based on naked conjecture or solely speculative factors." *Nat. Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 158 (Tex. 2012). A property owner must provide the factual basis on which his or her opinion of market rests. *Id.*; *see also Zhu v. Lam*, 426 S.W.3d 333, 341 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

 Here, the **only** reference at trial of the value of the allegedly converted equipment came from Todd Sullivan, whose testimony was speculative and conclusory:

Q. And approximately what was the value of those two gangways?

A. More than a million, less than two, I believe. I don't really know the exact number.

ROA.26701. This testimony is not competent evidence of damages under Texas law. *See Justiss*, 397 S.W.3d at 159-162 (property owner's conclusory statement of market value was insufficient to support the verdict). For this additional reason, this Court should render a take-nothing judgment on TXIT's conversion claim.

## VIII. Because GCC's promissory estoppel claim fails as a matter of law, this Court should vacate the $1.05 million offset associated with that claim.

GCC's promissory estoppel claim, for which the jury awarded $1.05 million, fails as a matter of law because (1) promissory estoppel cannot be used offensively under Texas law, and (2) by TXIT's own admission, the parties' express contracts cover the same subject matter as GCC's promissory estoppel claim. The district court erred in denying Polaris's Rule 50 motion on this claim.

### A.   Promissory estoppel cannot be used offensively.

GCC's affirmative claim for promissory estoppel claim fails as a matter of law because promissory estoppel is a defensive doctrine under Texas law and cannot create liability where none otherwise exists. *See Construcciones Industriales Del Golfo, S.A. de C.V. v. Searex, Inc.*, 1999 WL 423004, at *5 (5th Cir. 1999) (unpublished); *Stanwood Boom Works, LLC v. BP Expl. & Prod., Inc.*, 476 F. Appx 572, 576 (5th Cir. 2012) (per curiam); *Oliver Res. PLC v. Int'l Fin. Corp.*, 62 F.3d 128, 131 (5th Cir. 1995); *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 133 (Tex. 2005) (promissory

estoppel is a "defensive theory" that "does not create liability where none otherwise exists").

Texas law prohibits the offensive use of promissory estoppel for good reason. If promissory estoppel had the potential to make every oral promise or email enforceable, then the fundamental elements of contract formation—mutual assent and consideration—would quickly be rendered null.

### B.    Express contracts bar GCC's promissory estoppel claim.

GCC's promissory estoppel claim is also barred by the parties' existing contracts. Under Texas law, "the existence of a valid, express contract that covers the subject matter of the parties' dispute generally precludes recovery under a quasi-contract theory," such as promissory estoppel. *Williams v. Colonial Bank, N.A.*, 199 F. App'x 399, 403 (5th Cir. 2006) (per curiam) (citing *Doctors Hosp.1997, L.P. v. Sambuca Hous.*, L.P., 154 S.W.3d 634, 636 (Tex. App.—Houston [14th Dist.] 2004, pet. abated) (collecting promissory estoppel cases)); *accord Tremble v. Wells Fargo Home Mortg., Inc.*, 478 F. App'x 164, 166 (5th Cir. 2012) (per curiam) (applying Texas law). As the district court found, this rule extends not only to the parties to the contract, but also to third parties like GCC. ROA.8104-06 (citing *Lake v. Cravens*, 488 S.W.3d 867, 907-08 (Tex. App.—Fort Worth 2016, no pet.)).

Two contracts cover the same subject matter as GCC's promissory estoppel claim: (1) the ISBL Agreement, in which Polaris agreed to design and build the Facility for TXIT, ROA.41391-41496, and (2) the Tolling Agreement, under which TXIT agreed to use the Facility to process crude for GCC, ROA.45723-45819. To evade these fully integrated contracts, TXIT claimed that Polaris made additional promises to GCC—outside the scope of the contracts—relating to the Facility's ability to process crude feedstock that did not meet the contractual specifications. The parties referred to these crudes at trial as "heavy crudes." TXIT's attempt to skirt the contracts fails for two reasons.

*First*, TXIT repeatedly argued to both the court and the jury that Polaris's alleged promises regarding "heavy crudes" **were** incorporated into the ISBL Agreement by reference through a document called the "FEL-2 report." *See, e.g.*, ROA.22797, 25152-55, 24899, 25426 ("the FEL-2 study, which is part of the contract, says they were to give us a unit that would allow us to run heavy crudes and they didn't"), ROA.25462, 25226, 25229, 25258 (emphasizing to the court that the "heavy crude" claim was not limited to promissory estoppel, but was also "part of the benefit of the bargain under the contract"), ROA.25341-43, 26009-10, 27899; *see also supra* note 15. Polaris requested, and the district court refused, an instruction stating that the FEL-2 report was not incorporated into the ISBL Agreement.

ROA.28166. Because TXIT persuaded the district court to allow it to submit its "heavy crudes" claim under the ISBL Agreement and the jury found that Polaris failed to comply with the ISBL Agreement, ROA.17743-44, TXIT cannot now switch course and claim that heavy crudes fall outside the contract. *See Occidental Petroleum Corp. v. Wells Fargo Bank, N.A.*, 117 F.4th 628, 638 (5th Cir. 2024) (party was estopped from taking a position inconsistent with one it had convinced the district court to accept).

*Second*, even setting aside TXIT's inconsistent positions, the damages awarded by the jury under the promissory estoppel claim fall squarely within the "subject matter" of the contracts. TXIT sought—and the jury awarded—expenditures GCC allegedly made "in anticipation of a timely, safe, and operational Facility." ROA.17779. The parties' contracts explicitly and exhaustively address disputes over the timeliness, safety and operation of the Facility. ROA.41485 (project schedule), ROA.41401 (guaranteed readiness for commercial operations), ROA.41432 (delay liquidated damages), ROA.45657 (startup date); ROA.41409 (compliance with good engineering and construction practice), ROA.45785 (health, safety and environment). GCC cannot evade the parties' agreements by re-packaging its claim as one for promissory estoppel. Its promissory estoppel claim fails as a matter of law and the $1.05 million offset should be removed from the judgment.

**CONCLUSION**

This Court should (1) eliminate the $2.05 million offset in paragraph 2 of the judgment, (2) increase the associated pre-judgment interest in paragraph 7b of the judgment, (3) remand for an award of Polaris's reasonable attorneys' fees and non-taxable expenses, and (4) affirm the judgment (and any incorporated orders) in every other respect. If the Court grants a new trial for any reason, it should instruct the district court to reinstate Polaris's lost profits claim.

Dated: July 1, 2025          Respectfully submitted,

**HAYNES AND BOONE, LLP**

*/s/ Mark Trachtenberg*
Mark Trachtenberg
State Bar No. 24008169
Polly Fohn
State Bar No. 24065318
Kaylen Strench
State Bar No. 24126549
1221 McKinney, Suite 4000
Houston, Texas 77010-2007
Telephone: (713) 547-2000
Facsimile: (713) 547-2600
*mark.trachenberg@haynesboone.com*
*polly.fohn@haynesboone.com*
*kaylen.strench@haynesboone.com*

PILLSBURY WINTHROP SHAW
PITTMAN LLP

Tony Guerino
State Bar No. 00792552
Elizabeth E. Klingensmith
State Bar No. 24046496
609 Main St., Suite 2000
Houston, Texas 77002
Telephone: 713-276-7695
Facsimile: 713-276-7673
*tony.guerino@pillsburylaw.com*
*liz.klingensmith@pillsburylaw.com*

***Counsel for Defendant-Appellee
Cross-Appellant Polaris Engineering,
Incorporated***

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of July, 2025, I electronically transmitted the attached document to the Clerk of the Court of the 5th Circuit Court of Appeals using the ECF System of the Court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

*/s/ Mark Trachtenberg*
Mark Trachtenberg

## ECF CERTIFICATION

I hereby certify (i) the required privacy redactions have been made pursuant to 5TH CIR. R. 25.2.13; (ii) the electronic submission is an exact copy of the paper document pursuant to 5TH CIR. R. 25.2.1; (iii) the document has been scanned for viruses using Symantec Endpoint Protection active scan and is free of viruses; and (iv) the paper document will be maintained for three years after the mandate or order closing the case issues, pursuant to 5TH CIR. R. 25.2.9.

*/s/ Mark Trachtenberg*
Mark Trachtenberg

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B), as modified by this Court's order granting Polaris's motion for extra-length brief, because:

■     this brief contains 18,956 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f)).

2.     This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because:

■     this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Equity font.

*/s/ Mark Trachtenberg*
Mark Trachtenberg